[File No. 7252]

GEORGE E. ENGSTROM and Ella Engstrom, Respondents
v. BETTY LARSON and C. R. Larson, Appellants.

(55 NW2d 579)

Opinion filed November 7, 1952

*Shaft & Benson,* for appellants.

*Sinness & Duffy,* for respondents.

Sathre, J. This is an action for accounting of partnership property brought by the plaintiffs George E. Engstrom and Ella Engstrom against Betty Larson and C. R. Larson.

The defendants had sold the partnership property without the consent of the plaintiffs and mingled the proceeds with their own funds. The issues involve accounting and division of the proceeds of the sale and the value of the good will of the business. The case was originally tried before Honorable P. G. Swenson (now retired) District Judge. A judgment was rendered for the plaintiffs for $1900.75 and the plaintiffs appealed on the ground that the judgment was inadequate. The case was remanded with directions to take further testimony as to the respective values of the partnership property and the individual property of the defendants included in the proceeds of the sale. That case is reported in 77 ND 541, 44 NW2d 97. The case was thereafter tried before the Honorable John C. Pollock, District Judge. Judgment was rendered in favor of the plaintiffs and against the defendants in the sum of $6377.86. The case is here on appeal by the defendants, and the plaintiffs cross-appealed claiming interest on the amount found to be due the plaintiffs.

The facts are fully stated in the former opinion of this court and it will only be necessary here to summarize them briefly.

In October 1944, a partnership was formed between Claude P. Stone and George E. Engstrom for the purpose of operating a cafe in the Columbia Hotel at Grand Forks, North Dakota. Space in said hotel was leased to the partnership by the owners of the hotel, Claude P. Stone and D. F. McGowan. The cafe business was purchased by the partnership from one Alex Argeros. The purchase price for the cafe and equipment was $1200.00 and $555.00 was paid for merchandise on hand to be used in the operation of the cafe.

In addition $145.00 was turned over to the plaintiff Engstrom for operating expense, making a total investment of $1900.00. The partners borrowed said sum of $1900.00 from Claude P.

Stone, executing their note therefor and it was subsequently repaid out of the partnership funds. The plaintiff Engstrom served as manager of the cafe without compensation until August 1946 and thereafter he was paid $200.00 per month as manager. Stone and Engstrom operated the cafe until January 1946, at which time their wives, Betty Stone and Ella Engstrom were taken into the partnership as full partners.

In September 1945 Claude P. Stone and Betty Stone obtained a lease of the premises occupied by the partnership for a period of five years at a rental of $100.00 per month to be effective from October 1, 1945, and to expire October 5, 1950 with privilege of renewal for another period of five years. The other two partners George E. and Ella Engstrom had no knowledge that such lease had been obtained by Claude P. and Betty Stone. Claude P. Stone died in September, 1946 and his wife Betty Stone took over his one fourth interest in the partnership and the business was continued as before without any accounting up to the death of Claude P. Stone. Thereafter, and in February 1947, Betty P. Stone married C. R. Larson, one of the defendants in this action. The plaintiff George E. Engstrom continued as active manager of the partnership business until April 1, 1947, when he left to go into business at Carrington, North Dakota. When he left Ella Engstrom, with the consent of the defendants, took over as manager and continued as such until June 10, 1947. There was no accounting or change in the personnel of the partnership when George E. Engstrom left as manager on April 1, 1947.

On June 10, 1947, Ella Engstrom was called to Valley City because of the death of her mother. When she returned to Grand Forks, June 19, 1947, she was told by the defendants Betty and C. R. Larson that she had no further interest in the business; that when George E. Engstrom left in April 1947 he was eliminated and that thereafter Ella Engstrom had been working for the defendants Betty and C. R. Larson, and had no further interest in the business.

During Ella Engstrom's absence while attending her mother's funeral the defendants negotiated a sale of the cafe business including the equipment, fixtures, and dishes, to A. Russell Oliver

and Catherine D. Oliver for a consideration of $20,000.00. The Olivers were given a bill of sale, executed by C. R. Larson and Betty Larson. The bill of sale shows the consideration to be "one dollar and other valuable consideration" but it is admitted that the true consideration was $20,000.00. In addition to the sum of $20,000.00 the Olivers paid for the inventory of supplies the sum of $1056.74. Ten per cent of these sums was retained as commission by the real estate broker who negotiated the sale.

There is in evidence defendants' exhibit 7, a lease executed by the defendants C. R. Larson and Betty Larson to A. Russell Oliver and Catherine Oliver. The lease recites that it was made June 21, 1947. It leases to the Olivers certain space in the Columbia Hotel described therein for a period of five years beginning July 1, 1947 and ending July 1, 1952 with privilege of renewal at the expiration thereof. It provides that the rent for the premises shall be $150.00 per month for the first year, payable in advance, and for the remainder of the term the rent shall be computed on the basis of the percentage of the gross sales stated in the lease. The sale by the Larsons to the Olivers included the said lease with an option for renewal. It is contended by defendants that the cafe business sold to the Olivers had no good will and that one half of the purchase price of $20,000.00 represented the value of the equipment and the other one half thereof represented the value of the lease defendants' exhibit 7. There are two leases involved in this action, exhibit 8 the lease to Claude P. Stone and Betty Stone executed in September 1945 for five years with the privilege of renewal and exhibit 7 the lease between the Larsons and the Olivers executed June 21, 1947.

On the second trial before the Honorable John C. Pollock, District Judge, it was stipulated that:

"The transcript of the testimony taken upon the former trial of this action, together with all of the exhibits offered and received upon the former trial, may be received in evidence in this case, and that the testimony set forth in the transcript may be considered with the same force as if the witnesses had testified in open court, and that such evidence shall be deemed to have

been offered here by the party who offered that evidence or offered the exhibits upon the original trial."

Thereupon the plaintiff rested, and the defendants proceeded to take further testimony.

The defendant C. R. Larson testified that in April 1947 the plaintiff Ella Engstrom wrote the defendants that George Engstrom was going into business at Carrington, North Dakota and that she would like to take over the management of the cafe; that thereafter the defendants met with Mrs. Engstrom and it was agreed that she should take over the management of the cafe at a salary of $200.00 per month. Larson further testified that the business did not go too well under Mrs. Engstrom's management and that the business operated at a monthly loss of approximately $400.00 to $500.00 per month; that he told her that they could not continue in the business further at a loss; that when Mrs. Engstrom left for Valley City in June on account of her mother's illness she left one of the waitresses in charge of the cafe. With respect to the sale of the cafe to the Olivers he stated that the good will of the cafe business was purely nominal and that he would not "put a figure on it". On cross examination he testified as follows:

Q. And in your opinion was the cafe business and equipment that was sold to Mr. Oliver worth the $20,000.00 that he paid for it?

A. No, I don't believe the business and the equipment was worth $20,000.00.

Q. What do you think the business and the equipment was worth at that time?

A. What do you mean? Do you want a gross figure for the two items? Do you mean for the business? Do you mean for the good will?

Q. I mean the whole thing. If you were buying the restaurant you would get the good will and get the equipment and you would get everything that went with it. What was the whole thing worth?

A. I was trying to recollect the figures that we had on that

breakdown. It is about three and a half years since I have looked at them.

Q. I am not asking you to try to remember figures or anybody else's breakdown. I am just asking you, as a restaurant man and formerly connected with it, what that business that you listed with Boe at $20,000.00, what it was actually worth?

A. Well, we bought about six businesses and I am kind of confused in the so-called inventories and appraisals.

Q. You are not prepared at this time to answer that question?

A. That is right.

It clearly appears from the foregoing testimony that the defendant C. R. Larson did not feel that he could make a breakdown of the purchase price of $20,000.00 paid by the Olivers and place a separate value on the good will or other items included in the sale.

The defendant Betty Larson testified that her husband, defendant C. R. Larson, never had any direct interest in the cafe and that his only interest was as her husband; that she had had no experience with any other cafes; but was well acquainted with the operations in the Columbia cafe; she participated in the conversation with Mrs. Engstrom as to the management of the cafe after George Engstrom left and she agreed that Mrs. Engstrom should continue as manager. She visited the cafe from time to time while Mrs. Engstrom was in charge and she thought the management was bad, that the customers did not continue to come in the same numbers as before and that according to the auditor's report the business was operated at a loss. She admitted that she did not tell Mrs. Engstrom that they, defendants, listed the property for sale, or that they were negotiating a sale to the Olivers. With reference to exhibit 7, the lease to the Olivers, she stated it was made at the time of the sale as a part of the same transaction. Upon being asked whether the business, that is the cafe business, had any good will at the time of the sale to the Olivers, she stated: "It is a pretty hard question for me to answer, I suppose it would depend on who was buying it. I don't know."

Upon further questioning by her counsel she said the restaurant was well equipped but the operation was such as not to encourage business and new customers.

A. Russell Oliver, who with his wife purchased the Columbia Cafe from the defendants, testified that when they made the purchase of the restaurant there was no good will, at least so far as they, the purchasers, were concerned, and that they were interested principally in securing a location because there was a possibility that they might lose the location where they operated their cafe No. 1. He stated that the purchase price, $20,000.00 included the location, the business and the equipment, and that he entered into a separate agreement to rent at a monthly rental the premises where the business was located.

Harry Peabody, sales manager for the Grand Forks Restaurant Supply testified somewhat in detail as to the value of the equipment included in the sale to the Olivers. Most of this testimony related to the value of the property listed in exhibit 5, purchased by Stone and McGowan from the Fargo Food and Equipment Company in 1938, and purported to fix the value thereof as of June 1947 when the cafe was purchased by the Olivers, and was property in which the plaintiffs had no interest.

The plaintiff George Engstrom, testified as to the value of certain items that had been appraised by Mr. Peabody, for instance, Peabody put $1500.00 as the value of the compressors and the wires and installation, while Engstrom who had been active manager of the cafe since 1944 placed the value on the same compressors and equipment at not more than $300.00 or $400.00. Peabody and Engstrom differed considerably as to the value of the other items of equipment which were in the cafe and in which the plaintiffs had no interest, that is, Peabody placed a higher value thereon than did Engstrom. Engstrom stated that the partnership had replaced much of the stuff that was in the cafe when it was taken over from Argeros and that it had been increased substantially during the time the cafe was operated by the partnership; that more cups and saucers and silverware had to be purchased in order to take care of the increased business. He stated further that there were three items that were moved into the cafe from the bar at the time the

liquor divorcement law became effective, that is, a cigar counter, a back case and a magazine rack, and that the value of these three items was $150.00 to $200.00.

His estimate of the value of the cafe as a going concern in 1947, taking into consideration only the equipment belonging to the partnership, exclusive of the equipment that belonged to the bar or the hotel, was about $7000.00 or $8000.00. He stated further that the value of the cafe, as a going concern, including the good will, equipment and everything that went with the sale to the Olivers was $12,000.00 or $14,000.00, and that the value of all the stuff in the cafe that was not owned by the partnership was $7000.00 or $8000.00.

The defendants testified that the plaintiff George Engstrom never told them that he was leaving the cafe, and that the first information they had about his leaving was the letter, exhibit 12, written by Ella Engstrom to the Larsons, sometime in March 1947. Engstrom however, testified that he told the Larsons about his leaving some time during the latter part of March 1947. Mrs. Engstrom testified that Mr. Engstrom stayed with her two weeks helping her in the cafe after she wrote the letter, exhibit 12, to the Larsons.

As to the patronage of the cafe, Mrs. Engstrom said it did hold up. There was a decrease in the business for a while because of increase in prices. Asked whether the increase of prices was discussed with the Larsons she stated that it was under pressure from Larson that she increased the prices. She testified further as follows:

Q. Did Mr. Larson undertake to give directions with reference to the various matters connected with the operation of the cafe?

A. He was very grateful of what I was doing. I felt under pressure whenever he was there. He gave some constructive criticism, and very often criticism that was not constructive, and I was working under abnormal conditions all the time.

Q. Did he interfere with the help in any way?

A. Well, yes, he did.

Q. In what way?

A. He interfered with the chef, so I was forced to dismiss him and I got other help which was not as experienced.

The main issue in the case is as the value of the good will of the cafe business. The plaintiffs contend that the good will is of substantial value, while the defendants contend that it is of no value.

. The contention of the defendants that the cafe had no good will is based on the fact that during the period between January 1947 and June 1947 when the cafe business was sold by the Larsons to the Olivers it had been operating at a loss of $1225.00. However the evidence shows that substantial sums were spent for equipment and repairs and other expenses during that period; $528.23 was spent for a dishwasher, $368.94 was paid for repairs on the stove and $208.70 was paid for new dishes.

The federal income tax returns of the partnership for 1945 and 1946 were introduced in evidence from which it appears that the gross income for 1945 was $41,178.79 and the net income $3,239.31; the gross income for 1946 was $54,979.46 and the net income $4,524.31. The evidence further shows that the gross income of the cafe for the first five and one half months of 1947 was $34,755.36 in addition to which there was merchandise on hand of the value of $1056.74 as shown by the inventory taken when the sale of the cafe was made to the Olivers.

At the first trial the trial court expressed the view that since the partnership had shown no profit during its operation the first five and half months of 1947, but had operated at a loss, it had no good will, and that there was no testimony as to the value of good will, if there was any good will. In our former opinion we said "The trial court was correct in holding that the value of good will had not been proven, but we are agreed that the trial court was in error in holding that the facts and circumstances in this case established that no good will existed."

At the second trial A. Russell Oliver, one of the purchasers of the cafe from Larsons testified as follows:

Q. So far as you are concerned, Mr. Oliver, was there any good will for which you paid any price in that restaurant, and if so how much?

A. So far as we were concerned, there was not.

Q. There was no good will. Were you attempting to purchase a going business, Mr. Oliver, or was your—what was your purpose in buying the place?

A. We faced the rather strong possibility of losing our location in the Elk Building for our No. 1 and we wanted to get a place where we could continue in business, and that was the only thing we were interested in.

On cross examination Oliver testified as follows:

Q. When you speak about "good will", just what do you have in mind?

A. Well, I ordinarily have thought it to mean that the place has a good reputation and people like to go there. I suppose that would be as much as any, people like the place.

Q. You recognize the fact that a place which is a going business, where people do come either to eat or to buy clothing or buy merchandise, a place that the public is familiar with as being able to get what they want at that spot, and where they have been going for a period of years, that does have an asset value. Do you not agree?

A. Yes, I expect it would.

Q. And this Columbia Cafe as a matter of fact had been operating under some designation, and I mean there had been a Columbia—a cafe in the Columbia Hotel at practically this same location for a great many years, hadn't there?

A. Yes.

Q. And you know that the men who work on the Great Northern Railroad and the traveling public who go through on the Great Northern Railroad for a good many years patronized the cafe in the Columbia Hotel?

A. Yes, I suppose it would.

The defendant C. R. Larson testified as follows:

Q. As a man of experience in the restaurant business what is your opinion as to whether or not that place had a good will

value as of the date of the sale, and if it had a good will value, what in your opinion would that amount to?

A. Well, I don't believe in my opinion that the good will value amounted to very much from a point of sale.

Q. You say you don't believe it amounted to very much. Will you be able to put a figure on it?

A. Well, I don't believe I would put a figure on it.

Q. Would it be in your judgment purely nominal? Is that what you are saying?

A. Very nominal, yes, sir.

The testimony of Oliver and Larson as to the value of the good will of the cafe business was somewhat indefinite and appears to be an arbitrary expression of their own conclusions rather than a considered opinion based on a factual situation, except the fact that the business operated at a loss during the first five months of 1947. The fact that considerable expense had been incurred during that time for necessary equipment, repairs and replacements was not given any consideration.

The plaintiff George Engstrom testified as follows:

Q. You were familiar with the stuff that was in the cafe when you took it over from Argeros?

A. Yes.

Q. Did you replace much of that stuff during the time you were there?

A. Well, we replaced a lot—quite a lot of silverware, and pots and pans, and dishes, that was always a replacement.

Q. Did you increase the amount of that sort of thing during the time you were there?

A. Very substantially, yes.

Q. In other words, what he calls replaceable or incidental items were increased substantially from the time that you went in in 1944 until the time the stuff was sold in '47?

A. Yes; the reason being that we increased our business and we had to buy more cups and saucers and silverware in order to take care of the increased business.

Q. As I recall it, there was a substantial investment there in the spring of '47 in connection with a stove.

A. That happened after I left there.

Q. What, in your opinion, was the value of the cafe as a going concern in 1947, taking into consideration only the equipment that belonged to the partnership, disregarding now the stuff that belonged to the hotel or the stuff that came over from the bar?

A. Well, I should judge the equipment that we were in partnership on, that we had on hand, would be about seven or eight thousand dollars.

Q. Just the equipment, or are we talking about the entire business?

A. The equipment that was in there.

Q. I am asking you what was the value of the cafe as a going concern, including the good will, the equipment, everything that went with the sale?

A. Well, I should say twelve or fourteen thousand dollars.

Q. And what would you say was the fair value of all the stuff that was in the cafe that was not owned by the partnership?

A. Well, it should have been worth seven or eight thousand dollars.

Q. In other words, your testimony is that the equipment in the cafe would be worth about seven thousand, the equipment, I mean the stuff that belonged to the partnership, the equipment that didn't belong to the partnership were seven or eight thousand and the business another five or seven thousand?

A. I figure the good will of the going business was worth that.

George Engstrom was more familiar with the business of the cafe than either the defendants or Oliver. He had been the active manager from the time of the formation of the partnership by himself and C. P. Stone until April 1, 1947 or two and one half months before the sale to the Olivers. The business had been profitable during all of the time under his management, and undoubtedly had established a good will of some value.

Section 47-0710 NDRC 1943 defines good will as follows:

"The good will of a business is the expectation of continued public patronage, but does not include a right to use the name of any person from whom it was acquired." and

Section 47-0711 NDRC 1943 provides that:

"The good will of a business is property transferable in the same manner as any other".

"Sale of the assets of a firm ordinarily carries with it the partnership good will". 68 CJS Partnership, page 910, Good Will Sec. 396.

"The value of the good will of a business at the death of a partner may be estimated by the annual profits of the business before that time. It is the right of each partner to have the good will of the business converted into cash, if it has any value". 2nd Rowley Modern Partnership. Sec. 660, page 895.

"The good will of a business may be defined to be the advantage which it has from its establishment or from the patronage of its customers, over and above the mere value of its property and capital. The good will of a partnership rests in the probability that its old customers will continue their custom and will commend the partnership to others." Am Jur Partnership, page 203, Good Will Sec. 109.

See also MacFadden v. Jenkins, 40 ND 422, 169 NW 151.

The partnership had been operated at a profit since its organization in 1944 to April 1, 1947. The failure of the business to show profit or even the fact that it was operated at a loss from April 1st, 1947 to June 15th, 1947 when it was sold to the Olivers cannot be held to establish that it had no good will. As we have pointed out the gross income for the first five and one half months of 1947 was $34,755.36 in addition to merchandise on hand of the value of $1056.74 at the time of the sale by the defendants to the Olivers.

The defendants contend that in the sale to the Olivers the one half of the consideration of $20,000.00 was paid for the equipment in the cafe and one half thereof or $10,000 was paid for the opportunity to lease the premises. This lease is exhibit 7 executed by the defendants C. R. Larson and Betty Larson to the Olivers, covering space in the Columbia Hotel to be used by the Olivers for the operation of a restaurant and related activities and for no other purpose. It covered a period of five years with option to renew it for an additional period of five years.

There was another lease introduced in evidence to which reference has been made, defendants' exhibit 8, executed in September 1945 by the owners of Columbia Hotel to C. P. Stone and Betty Stone, leasing space in the Columbia Hotel to the Stones to be used as a restaurant for a term of five years from October 1st, 1947 with privilege of renewal at the expiration for an additional term of five years, at a monthly rental of $100.00. The plaintiff George Engstrom testified that he did not know that such lease was in existence until it was introduced in evidence. The rental provided for by this lease was $100.00 per month, and that is the rental the partnership had paid from its formation in October 1944 until the sale by the defendants to the Olivers in June 1947. Engstrom testified that he was of the impression that the partnership had a written lease. However the evidence does not establish that the partnership had a written lease, but continued to operate under an oral lease at a rental of $100.00 per month. No action had ever been taken to terminate the oral lease, and it was in force and effect at the time of the sale of the cafe to the Olivers in June 1947. It was an asset of the partnership, and whatever value it had inured to the partnership.

With reference to exhibit 8, the lease to Betty and C. P. Stone, Mrs. Stone testified that she did not tell either Mr. or Mrs. Engstrom that it was taken in the name of C. P. and Betty Stone. Her testimony was: "I didn't tell them anything. I had no reason to tell them anything about it."

When the defendants sold the cafe business and executed the lease, exhibit 7, to the Olivers, the partnership had not been dissolved and the oral lease under which it had operated since the formation of the partnership had never been terminated. The rights of the partnership under the oral lease were partnership assets and were included in the sale to the Olivers, and inured to all of the partners. It was therefore the duty of the defendants to account to the plaintiffs for the value of the lease as part of their interest in the proceeds of the sale to the Olivers.

"The relations of partners are confidential. They are trustees for each other within the meaning of the provisions of the title of Trusts, Uses and Powers. Their obligations as such trustees are defined by that title." Sec. 45-0109 NDRC 1943.

"The relationship of partners is fiduciary and imposes upon them the obligation of the utmost good faith and integrity in their dealings with one another with respect to partnership affairs. 40 Am Jur Partnership," Sec. 128 p. 217. See, also 47 CJ pp 771–772; Lay v. Emery, 8 ND 515, 79 NW 1053; Olivier v. Uleberg, 74 ND 453, 23 NW2d 39, 165 ALR 974.

"A general partner is the agent of the partnership in the transaction of its business and has authority to do whatever is necessary to carry on such business in the ordinary manner. NDRC 1943, 45–0203. But 'a general partner as such has not authority to do any of the following acts, unless his copartners have wholly abandoned the business to him or are incapable of acting . . . . 2. To dispose of the good will of the business; 3. To dispose of the whole of the partnership property at once, unless it consists entirely of merchandise; 4. To do any act which would make it impossible to carry on the ordinary business of the partnership; . . .' NDRC 1943, 45–0204".

Engstrom v. Larson, 77 ND 541, 44 NW2d 97.

At the first trial the defendant C. R. Larson testified that he purchased McGowan's interest in the Columbia Hotel together with the equipment in the bar and the equipment in the cafe not owned by the partnership and that the purchase price of the bar including the equipment was $8000.00. This sum be divided $4000.00 for the equipment, and $4000.00 for the good will of the bar. There was a considerable amount of equipment in use in the operation of the cafe by the partnership which was owned by the cafe which was included in the sale to the Olivers. Exhibit 11 Page 10 lists such equipment at its original purchase price in 1948 at the sum of $4589.10 and the equipment purchased by C. R. Larson in 1947, that is the equipment in the hotel bar at $4000.00 making a total of $7589.10 for the equipment sold to the Olivers in which the partnership had no interest. The trial court however was of the opinion that the testimony as to the value of said equipment was unsatisfactory and accordingly reduced it by $1000.00 and fixed it at $6589.10.

It appears from the evidence that the defendant C. R. Larson obtained a number of partnership checks signed in blank by

Ella Engstróm while she was at Valley City for her mother's funeral and that he filled in one of these checks for $800.00 in payment of rental for the cafe. This was an overpayment of rent in the sum of $500.00 and was disallowed. At the time of the sale to the Olivers there was cash on hand and in the bank in the sum of $138.76; the defendant C. R. Larson had later advanced to the partnership account $335.00. There had been advanced to each of the plaintiffs the sum of $250.00 which should be deducted from their share of the net proceeds of the sale to the Olivers to be distributed to the members of the partnership.

The trial court made its findings as to the distribution of the partnership assets in paragraphs XII and XIII of its findings of fact as follows:

"That a fair apportionment of the partnership assets, including the proceeds from the sale made to the Olivers, is as follows:

Sale price of cafe and lease by defendants .......... $20,000.00
Interest owned by defendants .................... 6,589.10
———————
Gross share of sale price to partnership .......... $13,410.90
Less 10% commission paid broker ............... 1,341.09
———————
Net amount of sale to partnership ............... $12,069.81
Sale of merchandise inventory to purchasers ...... 1,056.74
Partnership bank account and cash ............. 138.76
Overpayment of rent to defendants ............. 500.00
———————
$13,430.31
Less balance of amount advanced by Defts. ........ 335.00
———————
Amount of division between partners ............ $13,430.31

One-half of said amount to Betty Stone
    Larson ........................... $6,715.15

One-fourth of said am't to Geo Eng-
    strom ................. $3357.58

Less advance to him ....... 250.00
                                 _____
                              $3107.58

                                        $3107.58

One-fourth of said amount to Ella Eng-
    strom ................. $3357.58

Less advance to her ......... 250.00
                                 _____
                                        $3107.58

By amount of Engstrom advances ...... 500.00
                                                _____
                                                $13,430.31

That of the moneys received and retained by the defendants from the proceeds of the sale of the partnership assets they are accountable to the plaintiffs for the sum of $625.16, and that such amount is held in trust for the plaintiffs.

The trial court did not allow interest on the amount found for the plaintiffs and they have cross-appealed. They contend that they are entitled to interest from the date of the sale of the cafe to the Olivers. The question is thus presented whether upon the record before us the plaintiffs are entitled to interest.

It is established by the evidence that the partnership had not been dissolved when the defendants made the sale, and it is further established that the defendants made the sale without the knowledge and consent of the plaintiffs, and in disregard of their rights as partners. The defendants appropriated to themselves the entire proceeds of the sale without making or offering to make any settlement or adjustment with the plaintiffs. Their conduct in that respect amounted to fraud as to the rights of the plaintiffs.

Section 32–0305 NDRC 1943 provides:

"In an action for the breach of an obligation not arising from contract and in every case of oppression, fraud, or malice, interest may be given in the discretion of the jury." NDRC 1943, 32–0305.

"It is well established that a trustee who is guilty of a breach of trust in making a loan is liable for interest. Similarly, trustees are chargeable with interest if they have been negligent in paying money over as directed by the trust instrument, and a defaulting trustee may be charged with interest when he has had ample opportunity to gather in the trust fund and turn it over to the beneficiary. He may also be charged with interest if, in the management of the trust fund, he exceeds his power or makes unproductive investments. Where a trustee applies the money to his own use, he may be charged with compound interest, and nothing can be allowed him for his services in caring for the trust fund. On the other hand, if there is no unreasonable delay in applying trust money according to the directions of the trust, and there is no application made of it to his own use, the trustee will not be chargeable with interest." 30 Am Jur Interest, Sec. 27, pp. 21 et seq.

"No unbending rule can be laid down on the subject of the allowance of interest in accounting between partners; the propriety of the allowance in a particular case must be determined from the facts and circumstances, and the equities, of the case. It has been declared that the general rule pertaining to the allowance of interest for the use of money does not apply in partnership settlements.

Ordinarily, interest is not allowed on unascertained balances remaining in one partner's hands after dissolution of the firm, in the absence of an agreement to the contrary; but, where the circumstances are such as equitably to demand payment of interest, it will be allowed from the time when the partnership accounts should have been settled, as where one partner has retained the money an unreasonable length of time, or where he is wrongfully withholding it." 68 CJS Partnership, Sec. 397, p. 913.

The amount to which the trial court found the plaintiffs to be entitled was ascertained to be due as of the time of the sale, but it was wrongfully withheld by the defendants and appropriated to their own use. Under the record and all of the circumstances we think that the plaintiffs are entitled to interest according to law from the date of the sale.

The judgment of the district court is modified accordingly and as modified is affirmed.

MORRIS, C. J., and CHRISTIANSON, BURKE and GRIMSON, JJ., concur.