Albert D. SVIHL, Plaintiff/Appellant,

v.

George J. GRESS, Defendant/Appellee.

Civ. No. 8926.

Supreme Court of North Dakota.

Jan. 31, 1974.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiff-appellant.

Reichert, Howe & Hardy, Dickinson, for defendant-appellee.

ERICKSTAD, Chief Justice.

This is an appeal by the plaintiff, Albert D. Svihl, from those parts of the judgment of the District Court for the Sixth Judicial District, which set forth the manner in which the affairs of the dissolved partnership, Gress & Svihl Trucking, shall be wound up and the partnership assets divided.

Plaintiff-appellant, Albert D. Svihl, hereinafter referred to as Svihl, brought an action alleging that he and defendant-appellee, George J. Gress, hereinafter referred to as Gress, entered into an unwritten partnership agreement on or about October 1, 1970, under the firm name of Gress & Svihl Trucking to engage in the business of transporting livestock. Svihl further alleged that on or about August 16, 1971, Gress refused him access to the partnership assets and participation in the operation of the business. Svihl asserted Gress was disposing of assets of the firm and demanded an accounting for all monies and property received by the partnership.

Gress answered denying the existence of a partnership and any claimed right by Svihl to an accounting. Gress also counterclaimed alleging that if a partnership were found to exist, it existed only under an agreement whereby Gress would pur-

chase a tractor and cattle trailer and Svihl would operate the tractor and cattle trailer. Also, Gress alleged, the parties further agreed that Gress would recover his investment in the tractor and cattle trailer, at which time Gress and Svihl were to be co-owners of the unit. Gress asserted Svihl wrongfully refused to perform under the alleged partnership agreement, to his damage.

Svihl in his reply asserted that the tractor, cattle trailer, and other properties and equipment purchased were acquired for the benefit of Gress & Svihl Trucking.

The action was tried to the District Court, Stark County, sitting without a jury. The trial court made extended findings of fact which are not in issue and which we assume are correct. The court determined that a partnership did in fact exist between Gress and Svihl which was formed in September of 1970, began operations October 1, 1970, and continued operating until August 24, 1971.

The trial court found: that Gress initially loaned a total of $12,418.40 to the business, enabling it to make down payments on a tractor which cost $24,600 and a cattle trailer which cost $11,950, purchase some trailer equipment, pay license fees for several states and procure insurance for the tractor; that the partnership on April 15, 1971, borrowed the entire purchase price of $3,000 for a used Wilson grain trailer; that Gress also advanced a total of $447.07 for repairs, fuel, and other necessary operating expenses between September 14, 1971, and December 8, 1971, which was after the termination of the partnership but during the winding-up period; and that approximately $52,000 was produced by the partnership during its existence and used to meet operating expenses and debt obligations.

The court also found that while the testimony was conflicting as to the ownership interests in the tractor and two trailers used in the operation of the business, both parties agreed that neither of them was to receive in cash any profits from the operation of the business, with the exception of wages to Svihl, until such time as the financing institutions holding security agreements on the tractor and two trailers had been paid in full and Gress had been repaid what he had advanced to make it possible for the business to operate.

It was the finding of the lower court that on August 24, 1971, Svihl had consented to the dissolution of the partnership and the sale of the tractor, but that he had no knowledge of the identity of the purchaser or the terms of the contract Gress subsequently entered into later in the same day with Lyle Hartman relative to the sale of the tractor and Wilson grain trailer or the lease of the cattle trailer.

The lease of the cattle trailer to Hartman for a period of one year provided that Hartman was to pay a monthly rental equivalent of twenty per cent of the revenue produced from products hauled in said trailer, which rental at time of trial amounted to $11,201.21.

Shortly following August 24, 1971, before any payments had become due from Hartman upon the sales contract referred to earlier in this opinion, the tractor broke down, requiring extensive repairs, for which Gress gave Hartman $500 to cover approximately one-half the cost of such repairs.

Svihl's appeal is grounded upon alleged errors in the conclusions of law drawn from the facts as found by the trial court and heretofore summarized.

Basically, Svihl challenges the trial court's conclusions of law that Svihl was not entitled to a share of the rentals on the cattle trailer; that the $500 payment by Gress to Hartman for repairs to the tractor was a legitimate partnership expense; and that Gress was entitled to interest on his loan to the partnership. A discussion of the specifications of error will answer the question of whether the challenged conclusions of law made by the trial judge

follow from his findings of fact and the applicable law.

Svihl relies upon Section 45–09–14 of the North Dakota Century Code in support of his claim to a share of the profits from the rental of the cattle trailer.

"Rights of retiring or estate of deceased partner when the business is continued.—When any partner retires or dies, and the business is continued under any of the conditions set forth in subsections 1, 2, 3, 5, or 6 of section 45–09–13, or subsection 2b of section 45–09–10, without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, *he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership;* provided that the creditors of the dissolved partnership as against the separate creditors, or the representative of the retired or deceased partner, shall have priority on any claim arising under this section, as provided by subsection 8 of section 45–09–13." [Emphasis added.]

Svihl maintains that pursuant to the aforesaid law he should be allowed to elect to receive the value of his interest in the partnership at the date of dissolution plus interest, or in lieu of the interest a share of the profits earned subsequent to dissolution until such time as partnership assets are no longer used to make profits. In this case the effect of an election to share in the profits earned subsequent to dissolution, in addition to Svihl's share of the partnership equity, would entitle Svihl to half the rentals on the cattle trailer.

In support of this contention, we are referred to Vanderplow v. Fredricks, 321 Mich. 483, 32 N.W.2d 718 (1948). *Vanderplow* involved a written agreement establishing a limited partnership for the purpose of wholesaling beer, wine, and other beverages. The partnership consisted of one general partner and two limited partners, each of whom initially contributed $3,000 to the capital of the partnership. Under the partnership agreement the general partner was paid a salary. After deduction of his salary and the other operating expenses, only then were net profits to be divided equally among the three partners. A disagreement arose, after which the partners agreed to dissolve the partnership. Vanderplow, the general partner, served a notice of dissolution upon the limited partners and offered to pay off the equity interest of each limited partner. The limited partners refused the offer, claiming they were entitled to their share of the large appreciation in value of real estate which was a partnership asset purchased and used by the partnership and on which the partnership still owed money. From and after the date on which notice of dissolution was sent to the limited partners, Vanderplow continued to occupy the real estate and operate the business, using partnership assets, but treating the business as a sole proprietorship rather than a partnership.

In addition to quoting Section 42 of the Uniform Partnership Act, the equivalent of Section 45–09–14, N.D.C.C., the court in *Vanderplow* also quotes Sections 29 and 30, the equivalents of Sections 45–09–01 and 45–09–02, N.D.C.C., respectively.

"45–09–01. 'Dissolution' defined.—The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." N.D. C.C.

"45–09–02. Partnership not terminated by dissolution.—On dissolution the part-

nership is not terminated, but continues until the winding up of partnership affairs is completed." N.D.C.C.

Relying basically on the afore-mentioned sections the court in *Vanderplow* concluded:

> "A partnership is not terminated by dissolution but continues until the winding up of partnership affairs is completed. [Citation omitted.] So long as the partnership assets are used to make profits, so long must such profits be accounted for. [Citations omitted.] We hold that defendants [limited partners] are entitled to their share of the profits as well as the return of their capital up to the date of final decree winding up the firm. * * *" [Inserts added.] Vanderplow v. Fredricks, *supra,* 32 N.W.2d 718 at 721.

Gress counters with the argument that the partnership assets were sold and the business discontinued on August 24, 1971. The tractor and Wilson grain trailer, Gress maintains, were sold by contract to Hartman for $21,879.60 and $3,000, respectively. Regarding the cattle trailer, Gress being a cattle-order buyer in need of such a trailer, Gress asserts he "acquired" the trailer, presumably on August 24, 1971, which he then leased to Hartman, also on August 24, 1971. In further support of his argument, Gress urges us to consider that the tractor, cattle trailer, and Wilson grain trailer were purchased for a total cost of $39,550, titled in his name alone; all down payments were made by him; the unpaid balances were financed on promissory notes signed only by him, as were the security agreements and financing statements.

The trial court found that the fair market value of the cattle trailer as of the date of dissolution was $8,900. Gress says that under the circumstances where title was already in his name, he had advanced the down payment of $2,390 and assumed the outstanding obligation of $5,932, his total investment in the cattle trailer was $8,322, leaving a net partnership equity in the cattle trailer of $578. The partnership at this time was indebted to Gress in the sum of $10,850.39, to which the $578 partnership equity in the cattle trailer could be applied to reduce the indebtedness and thus complete the purchase of the cattle trailer for the fair market value of $8,900. Gress maintains there was little more he could have done to complete the purchase of the cattle trailer from the partnership other than actually pay the $578 equity in the cattle trailer in cash to the partnership. This, Gress maintains, would be a useless act, not required by the law, since a cash payment by him to the partnership for the equity in the cattle trailer would, in turn, under the unwritten partnership agreement, require the partnership to pay the money back to Gress to reduce the amount of the partnership indebtedness to him. Thus, by means of the down payment, the assumed obligations on the cattle trailer, and the set-off of the partnership equity in the cattle trailer against loans owed by the partnership to Gress, he maintains there has been a sale by the partnership to him which, when considered with the sale of the other partnership assets, completes the termination of the business. The argument follows that since assets of the partnership were no longer being used to earn profits, Svihl is not entitled to share in the profits.

Gress refers us to Rinke v. Rinke, 330 Mich. 615, 48 N.W.2d 201 (1951); Sechrest v. Sechrest, 248 Wis. 516, 22 N.W. 2d 594 (1946), and an annotation, 80 A.L. R. 12, Partnership—Profits After Dissolution, at 53, 54 (1932), in support of the argument that where there has clearly been a sale or absolute termination of a partner's interest, there is no right to share in profits earned subsequent to the sale or termination, since no partnership assets are being used to produce profits.

Such an argument leads us to the question of whether there is evidence of a valid sale of the cattle trailer, a partnership asset, by Gress acting in his partnership capacity to Gress acting in an individual capacity.

The fact that Gress had made the down payment on the cattle trailer, titled it in his name, and financed its purchase on promissory notes signed only by him does not prevent the cattle trailer from becoming a partnership asset.

"45–05–07. Partnership property.—1. All property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership, is partnership property.

* * * * * * *" N.D.C.C.

Considering these facts in light of Section 45–05–07, N.D.C.C., we conclude that the trial court was correct in holding that the cattle trailer was a partnership asset.

A more serious question is whether there was a sale of that asset to Gress. The pertinent part of the statute follows.

"45–07–04. Partner accountable as a fiduciary.—1. Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

* * * * * * *" N.D.C.C.

There is no finding by the trial court that establishes a sale of the cattle trailer by the partnership to Gress either with or without the consent of Svihl. The findings of the trial court reflect that the tractor and Wilson grain trailer were sold by Gress to Lyle Hartman without the knowledge of Svihl, and that the cattle trailer was leased by Gress to Lyle Hartman without the knowledge of Svihl.

The fiduciary standard applicable to Gress when dealing with partnership assets is a high one. We quote from Justice Cardozo, then Chief Judge of the New York Court of Appeals, in Meinhard v. Salmon, 249 N.Y. 458, 463–464, 164 N.E. 545, 546, 62 A.L.R. 1 (1928):

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. *Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.* As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Wendt v. Fischer, 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." [Emphasis added.]

In Engstrom v. Larson, an action for partnership accounting in which a partnership business was sold without the knowledge or consent of the complaining partners, the court said:

"The relationship of partners is confidential and fiduciary; they are trustees for each other, and there is imposed upon them the obligation of the utmost good faith and integrity in their dealings with one another with respect to the partnership affairs. * * *" Engstrom v. Larson, 79 N.D. 188, 55 N.W.2d 579, Syllabus ¶ 4 (1952).

In view of the standard of conduct Gress is held to and the absence of any evidence in the record showing a sale of the cattle trailer by Gress for the partnership to himself in his personal capacity with the knowledge and consent of Svihl, such self-dealing cannot be con-

doned. Since there was no sale of the cattle trailer by the partnership to Gress, the cattle trailer remained partnership property when it was leased to Hartman. The cases cited to us by Gress which deal with situations wherein the assets of the partnership were actually sold and the business was terminated, such as *Rinke* and *Sechrest,* are inapplicable.

In Rinke v. Rinke, 330 Mich. 615, 48 N. W.2d 201 (1951), suit was brought alleging the dissolution of two partnerships and seeking an accounting. The partnerships involved a general hardware and appliance store, Rinke Brothers, and an automobile dealership and garage, Rinke Motors. The partnerships consisted of the same three persons, one of whom was in the active control and management of the hardware and appliance store, namely George, and two of whom were in the active control and management of the automobile dealership, namely Edgar and Norbert. Prior to 1948 Rinke Motors held General Motors Corporation franchise agreements from Cadillac, Buick, Oldsmobile, Pontiac, and Chevrolet, which were obtained primarily through the efforts of Edgar. General Motors became concerned about Rinke Motors' selling cars manufactured by all divisions of GM. Oldsmobile Division would not renew its franchise for the next model year. The other divisions insisted on separate agencies to sell their cars. Edgar participated in negotiations on behalf of himself and his brothers to continue granting franchises for Cadillac, Buick, Pontiac, and Chevrolet. It was finally resolved that GM would issue franchises to Edgar for the coming year covering Buick and Chevrolet, while Norbert would be issued new franchise agreements for Cadillac and Pontiac. The franchise agreements were negotiated on a year-to-year basis in the past and the new franchise agreements were also negotiated in this manner.

Edgar and Norbert contended that they kept George fully advised as to the negotiations and the final position of General Motors as to the manner in which GM would consent to issuing the franchises. Edgar and Norbert advised George they wished to dissolve the two partnerships and engage in business separately. George made no showing that he had any interest in obtaining an automobile franchise or that he objected to his brothers' doing so.

Edgar, in looking for a site on which to erect a building and from which he could conduct his new business, decided to use some land not currently being used by the partnership, which had been purchased as an investment by the partnership. Title to this real estate was taken in the names of the three partners individually rather than in the name of either partnership. George did not wish to interfere with Edgar's plans, so with full knowledge of the situation he and his wife, along with Norbert and his wife, deeded their interests in the property to Edgar.

After notice of dissolution no business was conducted by Rinke Motors other than the sale of existing inventory. The profits from the sale of the inventory were divided equally among Edgar, Norbert, and George. The new franchises were executed and Edgar and Norbert carried on their businesses individually while George managed and controlled the hardware store.

At trial and on appeal, George asserted that the partnership, Rinke Motors, was continued and that he should share in the profits. The appellate court affirmed the trial court's finding that the partnership business was not continued after dissolution except for possibly the hardware store that George operated. George made no accounting for the profits of the hardware store, nor did Edgar or Norbert insist on his doing so. The court stated that it was fair to assume on the basis of the parties' conduct that the hardware store belonged to George. Edgar and Norbert did not seek any profits from the hardware store, but only an accounting of the value of property on hand at date of dissolution. The business of Rinke Motors was not continued and no franchises were issued to

it. The franchises were issued separately to the new businesses.

**■** Vanderplow v. Fredricks, *supra,* is distinguished in *Rinke.* In *Vanderplow* the plaintiff continued to operate the business as a sole proprietor, using partnership assets. In such a case the defendants were entitled to a share in the profits until final accounting. In *Rinke* the business was not continued and George could not require Edgar and Norbert to account for the profits earned by them in their separate businesses subsequent to dissolution of the old partnerships, but prior to final accounting. In the case at bar, the cattle trailer, an asset of the partnership, was not sold, but continued to be used as a partnership asset. As a partner, Svihl is entitled to his share in such profits realized by the use of said asset until final accounting.

In *Sechrest,* Howard Sechrest brought an action against Edmonde Sechrest for an accounting on dissolution of the partnership. Howard and Edmonde were partners in a machine and welding business in which no written contract of partnership was ever entered into. Since Edmonde wished to retire from the partnership, he requested dissolution of the partnership. It was at this time Howard and Edmonde entered into an agreement which provided that Howard would continue the business by himself; that Edmonde was to retire from the business and have no further interest in the business; that until the exact settlement was determined by final accounting Howard would make weekly advance payments to Edmonde. After the date of dissolution Howard alone continued to operate the business.

Edmonde maintained he was entitled to share in the profits of the partnership earned after dissolution. The Supreme Court of Wisconsin said the agreement between Howard and Edmonde controls. By that agreement Edmonde agreed to retire and have no further interest in the business. The court quotes Section 123.37 of the Wisconsin statutes, which is similar to

Section 42 of the Uniform Partnership Act and Section 45–09–14 of the North Dakota Century Code, relied upon by Svihl in support of his claim to a share of the rentals from the cattle trailer. Explaining Section 123.37 of the Wisconsin statutes, the Wisconsin court says:

"The reason for the provision in the partnership law for payment of either interest on the retiring partner's share of the assets or profits, at his option, is not because the retiring partner still retains an interest in the business but rather is intended to give him a return on assets belonging to him which still are being employed in the business by the remaining partner. Where, of course, there has been a sale of the partner's interest, he is precluded from asserting any right in the subsequently earned profits since none of his assets have been employed in the earning of such profits. 80 A.L.R. pp. 53, 54." Sechrest v. Sechrest, 248 Wis. 516, 22 N.W.2d 594 at 596 (1946).

In the Sechrest case Edmonde was precluded from sharing in the profits earned subsequent to dissolution because he had sold his interest in the partnership. The holding in *Sechrest,* as previously stated, is inapplicable to the case at bar since there is no showing of a sale of the cattle trailer.

In his second specification of error Gress challenges the trial court's determination that a $500 tractor repair bill paid by Gress to Hartman was a proper partnership expense.

It was on August 24, 1971, that Svihl and Gress agreed that the partnership should be dissolved. On that day Gress entered into a contract with Hartman covering the sale of several items of partnership property, including the tractor. That contract included the following:

"Repairs: Party of the Second Part [Hartman] does hereby agree to keep and maintain said tractor and trailer in good repair and not permit the same to become inoperable. In addition thereto,

said Party of the Second Part shall keep the tractor and trailer free and clear of any and all liens of whatever nature that may arise by reason of any repairs or work done on said tractor or trailer."

The following statute is pertinent:

"45–09–07. Power of partner to bind partnership to third persons after dissolution.—1. After dissolution a partner can bind the partnership except as provided in subsection 3 of this section:

"a. By any act appropriate for winding up partnership affairs or completing transactions unfinished at dissolution;

* * * * * * *" N.D.C.C.

Was the act of Gress in making such a payment to Hartman an act appropriate for winding up partnership affairs?

Gress negotiated an advantageous price for the tractor to the benefit of the partnership, selling it to Hartman for $22,000. Shortly after delivery of the tractor to Hartman and before any payment became due on the contract, the tractor broke down, necessitating substantial repairs. Gress asserts that Hartman was just getting started in the business and that if the tractor was not operating producing income there would have been no money to make payments to the one holding the security interest, and that on default by Hartman, the tractor would have been returned to the partnership, at which time the partnership would have had to pay the entire amount of the repair bill not just one-half of it, and in addition it would have had to find another buyer. Gress asserts it was in the best interests of the partnership to pay a part of the repair bill so that the tractor could quickly get back on the road and earn money to make the necessary payments.

Svihl argues that the $500 payment to Hartman by Gress was in contravention of the sales contract, was a personal liability incurred by Gress that was not properly chargeable to the partnership. The trial court in its conclusions of law held the, $500 payment to be a partnership debt. We agree that Gress's payment of part of the repair bill on the tractor at that crucial time was necessary to save the sale and that accordingly it was a reasonable partnership expense.

The next issue we shall consider is whether the trial court erred in permitting Gress to collect interest from payments made by Hartman upon the sales contract for the tractor and Wilson grain trailer. Under the terms of the unwritten partnership agreement, the partnership obligations to Universal C.I.T. Finance Corporation, First National Bank & Trust Company of Fargo, First National Bank of Dickinson, and Gress himself were to be paid before the partners were to share in the profits.

The lower court found that the partnership, before receipt of any payments from Hartman on the purchase contract, owed Gress $10,850.39, plus $500 paid by Gress to Hartman for repairs upon the tractor, or a total of $11,350.39. By judicial decree, Gress acquired the cattle trailer, which, when valued at $8,900, had a partnership equity of $2,967.71. This equity was credited against the $11,350.39 advance to the partnership, leaving a balance due Gress from the partnership of $8,382.68.

It is this $8,382.68 debt owed to Gress which remains unpaid after Universal C.I.T. Finance Corporation, First National Bank & Trust Company of Fargo, and the First National Bank of Dickinson should have been paid. Under the partnership agreement, neither Gress nor Svihl was yet entitled to a share of the profits of the business since there was an unpaid creditor remaining, namely Gress. Svihl asserts that the lower court erred in allowing Gress to personally recover interest from payments made by Hartman on the sale contract until payments equalled $8,382.68.

Under the contract of sale Hartman was to pay interest on the tractor and Wilson

grain trailer at the rate of 8½% per annum. The judgment of the lower court allows Gress to receive all interest payments made by Hartman until principal payments also made by Hartman total $8,382.68. Svihl was not allowed to share in the interest payments, nor were such payments required to be used to reduce the partnership indebtedness to Gress.

 Under such an arrangement, Gress was selling partnership assets and being allowed to keep interest payments made as a result of that sale without any duty to account for such interest to the partnership. There is no evidence that Gress and Svihl contemplated that the partnership pay Gress interest on the money he advanced to the partnership. To the contrary, the evidence is that neither Gress nor Sivhl was to participate in any profits or take any funds from the partnership until all debts were paid. Allowing Gress to receive this interest violates the partnership agreement, since he is being allowed to profit from money generated by partnership assets prior to the time all debts are paid. The total payment, including interest, made by Hartman should be applied to reduce the debt to Gress.

Lest it be thought that we have arrived at this conclusion too precipitately, let us consider the arguments of counsel, pertinent provisions of the Code, and the cases upon which they rely. Both parties rely upon the following statute:

"45–07–01. Rules determining rights and duties of partners.—The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

\* \* \* \* \* \*

"3. A partner, who in aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, shall be paid interest from the date of the payment or advance.

"4. A partner shall receive interest on the capital contributed by him only from the date when repayment should be made.

\* \* \* \* \* \* \*" N.D.C.C.

Svihl maintains that under Subsection 3 above, there was no capital contribution, since it was established at trial that the partnership was financed entirely by borrowed money; that even if the loan to the partnership could be considered capital, interest is still not allowable since there was no showing that the amount contributed is in excess of that which he agreed to contribute, as required under Subsection 3, Section 45–07–01, N.D.C.C.

Likewise, Svihl asserts, if the loan were to be considered capital, it would be barred by Subsection 4, since "the date when repayment should be made" has not yet arrived, presumably because the installment contract with Hartman limits the amount of cash available from time to time to pay the loan.

Gress maintains that the time for repayment was contingent on firm profits which never occurred; therefore, repayment should be from date of sale, and interest is due from that time.

Both parties refer us to Hargett v. Miller, 235 Ark. 523, 361 S.W.2d 83 (1962), in support of their arguments. In *Hargett* a partnership was formed for the purpose of erecting and operating a motel. The motel was financed by borrowing $30,000. One partner, Miller, borrowed $21,000 on a note secured by a mortgage on property owned by Miller. The other partner, Hargett, borrowed $9,000 secured by a mortgage on property owned by him. Each partner signed the other's note.

No written partnership agreement existed, but it was agreed Hargett would build and manage the motel while Miller would continue to practice medicine and pay $825 in monthly installments to retire the in-

debtedness of the partnership until such time as the motel was operational and there was money on hand to make the monthly payments. Miller was to be reimbursed for the monthy payments made by him as conditions at the motel permitted.

Several years later, the motel was sold for $120,000. The partners with cash in hand paid the balance of the original $30,000 loan, reimbursed Miller for the monthly payments made by him, and discharged another obligation of the partnership. There was money remaining after these partnership debts were paid, but Hargett and Miller could not agree on its division.

The lower court allowed Miller interest on the monthly payments made by him to the bank where the original loan for the partnership was procured. One of Hargett's contentions on appeal was that the allowance of interest in such a case was erroneous. The Arkansas Supreme Court agreed with Hargett, citing the Uniform Partnership Act, Ark.Stats. 65–118, subparagraph (d), which is comparable to Subsection 4, Section 45–07–01, N.D.C.C.

The Arkansas Supreme Court stated that under the original agreement, Miller was to be repaid when the business of the motel was producing money sufficient for that purpose. Sufficient money was not produced until the motel was sold. Miller was paid when the motel was sold and the money available; thus, no interest should have been allowed.

In the case at bar, due to the provisions in the contract with Hartman covering the purchase of partnership assets, sufficient money was not generated to repay Gress; and under the unwritten partnership agreement between Gress and Svihl, the date when repayment should have been made had not arrived at the time of the sale to Hartman, since cash was not available to pay the partnership debt to Gress, nor would it arrive until the final installment paid by Hartman, including interest, which would reduce the partnership debt to Gress to zero. Under any reading of Section 45–07–01, N.D.C.C., or *Hargett,* interest to Gress in his individual capacity is not allowable.

Both parties have referred us to Engstrom v. Larson, *supra,* 55 N.W.2d 579, as authority for their positions. As stated earlier in this opinion, *Engstrom* was an action for a partnership accounting in which the partnership business was sold without the knowledge or consent of the complaining partners. The evidence in that case established that the partnership had not been dissolved when defendants made the sale. Defendants in *Engstrom* disregarded the rights of their partners and failed to offer to make any settlement with plaintiffs as a result of the sale. The court in *Engstrom* found their conduct amounted to fraud as to the rights of the plaintiffs. Under that case, Gress is *not* entitled to interest.

We conclude that the total payment, including interest on the contract for sale of the tractor and Wilson grain trailer, under the partnership agreement, should be applied to reduce the partnership debt to Gress. The result will be that Gress will not receive interest on the money he advanced to the partnership.

On remand the trial court may take additional testimony relative to the value of the cattle trailer on August 14, 1972, taking into consideration its depreciation during the time it was used by the partnership under lease to Hartman and any other expenses incurred by Gress in connection with the lease to Hartman.

The judgment of the trial court is therefore reversed and the case is remanded with instructions to the trial court to enter judgment not inconsistent with this opinion.

ERICKSTAD, C. J., and VOGEL, KNUDSON, PAULSON and TEIGEN, JJ., concur.