FRED CONKLIN AND HELEN W. CONKLIN, APPELLANTS AND CROSS-APPELLEES, v. VERNON S. RANDOLPH AND CAROL W. RANDOLPH, HUSBAND AND WIFE, ET AL., APPELLEES AND CROSS-APPELLANTS.

281 N. W. 2d 913

Filed August 14, 1979. No. 42234.

Wright & Simmons and John A. Selzer, for appellants.

Dennis M. Coll of Raymond, Olsen & Coll and Rick L. Ediger, for appellees.

Heard before BOSLAUGH, CLINTON, BRODKEY, and HASTINGS, JJ., and BARTU, District Judge.

BRODKEY, J.

This action originated in the District Court for Scotts Bluff County as an action for an accounting between Fred Conklin and Vernon S. Randolph as partners in an oral partnership known as R & F Land Co., and also as a partition proceeding with reference to certain real estate owned by the partnership. A hearing on a motion for summary judgment for the partition of the real estate was held on January 30, 1976, and on February 9, 1976, the court entered its order finding and decreeing that an un-

divided one-half interest in the real estate in question was owned by Fred Conklin and an undivided one-half interest by Vernon S. Randolph. The court also ordered the appointment of a referee to make the partition and retained jurisdiction for all other matters involved in the action. Thereafter, the referee filed his report finding that in his opinion the property should be sold and the proceeds thereof divided, as it was not practical to physically divide the premises without prejudice to the owners thereof. No sale of the premises, however, was ever held; and the entire case came on for trial on December 1 and December 13, 1977, upon a stipulation of facts between the parties and the testimony of witnesses.

The court entered its decree on May 3, 1978, making certain findings of fact with reference to disputed issues in the accounting action, and also finding that, upon the partition sale of the partnership real estate, certain debts and court costs should be paid and the proceeds divided between the parties, awarding 12.5 percent thereof to Fred Conklin and Helen W. Conklin, and 87.5 percent to Vernon S. Randolph and Carol W. Randolph, and further reciting that the distribution should be a full and complete settlement for all claims, properties, monies, and accounts between the parties arising out of the partnership of R & F Land Co. Plaintiffs, Fred Conklin and Helen W. Conklin, have appealed to this court from that decree, and the defendants, Vernon S. Randolph and Carol W. Randolph, have also cross-appealed therefrom. The first two assignments of error in the briefs of the respective parties are identical, and they are as follows: "(1) The trial court erred in departing from the stipulated and determined equal ownership of the partnership real estate; and (2) the trial court erred in ordering partition proceedings of equally owned partnership real estate to be distributed 12 1/2% and 87 1/2%." In

effect, therefore, both parties agree that the division of the real estate ordered by the trial court is in error and that the matter should be reversed.

By way of background, it appears that the parties have been acquainted with each other for many years. Randolph had operated a Chevron gas station in Scottsbluff and was acquainted with Conklin, who from 1951 to 1973 was engaged as a commission sales agent for Continental Oil Company (hereinafter referred to as Conoco), his territory being the western half of Scotts Bluff and Morrill Counties. In 1966, Conklin approached Randolph and discussed the possibility of forming a partnership to construct a Conoco gas station at a different location in Scottsbluff. It appears Conklin had purchased a prebuilt packaged Conoco gas station which he desired to erect on a lot to be purchased by the proposed partnership. It was agreed the partnership would be formed, although no written agreement was ever entered into between them and their specific understanding of the details at the time was somewhat vague. They did, however, apply for financing to the Scottsbluff National Bank and Trust Company, and consulted with Robert Finke, a vice president, with regard to the details of the loan required. In any event, the building was thereafter erected on a lot purchased by the partnership, as well as a carwash operation, and the station opened for business during the last week of November 1969. Although the partners anticipated obtaining a 10-year loan from the Scottsbluff National Bank and Trust Company (hereinafter referred to as the Bank), the Bank was unwilling to give a 10-year loan on the carwash equipment, but instead made a 10-year loan on the real estate in the amount of $37,500, payable monthly at the rate of $435.43; and a 5-year loan on the equipment in the amount of $25,000, payable monthly at the rate of $610.40, or a total monthly payment of $1,045.83, instead of the approximately $600 per

month originally anticipated by the partners. The partnership also obtained a franchise for the sale of certain carwash machinery and equipment, but the franchise was taken in the name of Conklin alone. The record reveals that Randolph operated three independent businesses from the premises in question, which businesses were owned by him and not by the partnership. These were the operation of the service station, the sale of carwash services to the public, and also the sale of campers and travel trailers. By agreement, Randolph's accountant, Lee Daley, served as accountant for the partnership and prepared the partnership records and tax returns. Carol Randolph, wife of Vernon, acted as bookkeeper for the partnership. There is no question or dispute that Randolph did not pay any rent to the partnership for the use of the premises in conducting his individual businesses, his reason for his failure to pay being a matter of dispute between the parties.

It is clear from the record that after the construction of the station, Conoco leased the station from the partnership for a rental of 1 dollar per month plus 2 cents for every gallon of gas delivered to the station, and there is in the evidence a written lease between the parties to that effect. Conoco then leased the station back to the partnership for the sum of 1 dollar a month, and there is likewise a lease evidencing this transaction in the record. The original lease to Conoco was for a period of 5 years commencing on April 1, 1969, and ending on April 1, 1974, with an option to renew for an additional 5 years, which Conoco exercised on February 28, 1974. The renewed lease expired on April 1, 1979.

Randolph testified that Conklin had promised to pay him 1 cent on every gallon of gas delivered by Conoco to the station, and the trial judge in his order found that Conklin, as part of the partnership agreement, was to pay to Randolph, and not to the partnership, from his own funds, 1 cent per gallon for

each gallon of gas delivered by Conoco to the service station. Conklin admitted in his testimony that he had promised to contribute to the partnership from his commission 1 cent on every gallon of gas delivered to the station, but also claimed that one-half of his 1-cent commission actually had been included in the 2 cents a gallon which Conoco paid to the partnership under its written lease. There is no evidence in the record, however, that Randolph knew of or agreed to this arrangement. In any event, Conklin paid the other one-half cent of his commission directly to the partnership. It appears from the record that both Randolph and Conklin agreed Randolph was to apply the income from the Conoco rent and from Conklin's commission payments to pay the monthly loan payments due the Bank, and if there was insufficient income for that purpose Randolph was to make up the difference. The profits from the sale of the carwash operations were to be used to pay the other expenses of the partnership's business. The District Court, however, found that Randolph was to make the payments on the real estate mortgage to the Bank in the amount of $435.43, and that the payments on the equipment and carwash would come primarily from proceeds from the sale of carwashes by the parties.

In the beginning, substantial profits from the sale of carwash equipment and operations were deposited to the partnership bank account. The records reveal, however, that the last carwash operation was sold in 1973. During the period commencing in October 1975 and extending to May 1977, Conklin refused to endorse the rent checks received from Conoco which were made payable to both Conklin and Randolph. These checks total $6,996.88 and have been deposited with the District Court awaiting further disposition. In June 1977, Conoco sold its entire western Nebraska operation to a successor company known as Copsey Basin and Oil Co. (herein-

after referred to as Copsey, Inc.), which company continued to supply the partnership station and continued to pay the partnership the rent of 2 cents for every gallon of gas delivered to the station. As of December 1, 1977, six checks had been received by the partnership from Copsey, Inc., totaling $1,977, and were apparently deposited in Randolph's bank account in order to make the monthly loan payments to the Bank.

It also appears from the record that from time to time Randolph loaned the partnership money for the purpose of paying its real estate taxes, special assessments, life insurance premiums on the lives of the partners as security for the mortgage, and also the cost of installing a lead-free gas tank that the station was required to do by federal law. It appears that Randolph, on advancing the funds in question, executed a series of notes, payable to himself, signed R & F Land Co. by V. S. Randolph. One note was dated November 30, 1974, in the sum of $3,499.93; the second was dated October 31, 1975, in the amount of $5,288.32; the third was dated October 31, 1976, in the amount of $4,511; and the fourth was dated August 31, 1977, in the amount of $3,695.18. All of these notes bore interest at the rate of 6 percent per annum.

As previously stated, Conklins filed their petition against the defendants in this action on November 26, 1975, requesting the partition of the property and an accounting of the partnership's money and property. The defendants Randolph filed their answer on December 30, 1975, also requesting that the partnership be dissolved and that an accounting be made of the monies and properties of the partnership. The District Court heard testimony and entered its decree on May 3, 1978. We have previously indicated in this opinion some of the findings of the court contained in that decree, and we shall discuss other findings contained therein hereinafter in this opinion.

We have reviewed the record before us and have concluded that the matter must be reversed and remanded to the District Court for further proceedings in light of our findings and directions as hereinafter set out. The Uniform Partnership Act was adopted in Nebraska in 1943 and appears as sections 67-301 to 67-343, R. R. S. 1943. Section 67-318 of that act reads, in pertinent part, as follows: "The rights and duties of the partners in relation to the partnership shall be determined, *subject to any agreement between them,* by the following rules: (a) Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits. (b) The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business or property. (c) A partner, who in aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, shall be paid interest from the date of the payment or advance. (d) A partner shall receive interest on the capital contributed by him only from the date when repayment should be made. (e) All partners have equal rights in the management and conduct of the partnership business. * * *." (Emphasis supplied.)

We find that the provisions of the Uniform Partnership Act control in the instant case, except where a different agreement exists between the parties.

Although the trial court in its decree did not find when the partnership in question was dissolved, it is clear that the plaintiffs expressed their intention to dissolve the partnership in their petition filed herein,

and the defendants Randolph also expressed their intention to dissolve the partnership in the answer they filed to plaintiffs' petition. We believe the matter is specifically covered by section 67-331, R. R. S. 1943, of the Uniform Partnership Act, which provides as follows: "Dissolution is caused: (1) Without violation of the agreement between the partners, * * * (c) By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking, * * *." Thus, absent an allegation and evidence of acts indicating an earlier dissolution, we find that the partnership was dissolved by the express will of the partners on December 30, 1975, the date the defendants filed their answer in District Court. Since that date, the partnership has been engaged in the winding up of the partnership business. Another pertinent provision of the Uniform Partnership Act, controlling in this appeal, is section 67-340, R. R. S. 1943, which provides as follows: "In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary: * * * (b) The liabilities of the partnership shall rank in order of payment as follows: (I) Those owing to creditors other than partners, (II) Those owing to partners other than for capital and profits, (III) Those owing to partners in respect of capital, (IV) Those owing to partners in respect of profits. * * *." It is clear from the above statute that after all the creditors of the partnership are repaid, the partners are to be repaid the amounts owing to them other than for capital and profits, and also the amounts owing them in respect to capital contributed before the profit, if any, is divided between them according to their agreement. In this case, we conclude that the agreement between the parties was to divide the profits and indebtedness, if any, on a fifty-fifty basis.

We might also add that the income tax returns filed for the partnership by their accountant for the years 1970-1974 also indicate it was a fifty-fifty partnership. See, also, § 67-318 (a), R. R. S. 1943.

In the final accounting between the parties, Conklin is entitled to be credited for the amount he invested for the prebuilt packaged service station. In the stipulation entered into between the parties in lieu of a pretrial hearing, the parties agreed that the partnership had discharged $3,840.96 of the indebtedness remaining on the service station, plus interest. We believe Conklin should be given the opportunity to establish the amount he personally invested in the service station, and should be credited with this amount without interest thereon. It is our finding that, as part of the partnership agreement, Conklin agreed to contribute the service station to the partnership, and hence, under section 67-318 (c), R. R. S. 1943, he is not entitled to be paid any interest thereon.

Randolph has contended Conklin agreed to pay him personally, and not the partnership, 1 cent on every gallon of gas delivered to the station, in addition to the 2 cents per gallon of gas received from Conoco. Conklin contends his agreement was to pay 1 cent per gallon of gas delivered to the station to the partnership, and that, in fact, he did so by paying one-half cent per gallon personally, and the other half cent was deducted by Conoco from his commission and included in the 2 cents that Conoco paid the partnership. The record reveals that Conoco paid the 2 cents per gallon of gas by checks payable to both parties, and continued to pay the 2 cents per gallon even after Conklin's employment with Conoco ended. Furthermore, the lease was renewed for an additional 5 years, with the rent remaining at 2 cents per gallon of gas delivered to the station. Randolph testified that he told Robert G. Finke, the vice president of the Bank, during the negotiations of financing for the new station, in Conklin's presence, that

the loan was to be repaid from the 2 cents a gallon paid by Conoco, "and that Mr. Conklin was going to pay one cent a gallon and that I would be responsible for making the payments on the note." It was Randolph's testimony that he did not know the 1 cent per gallon of gas, promised by Conklin, was to come from and was to be conditioned upon Conklin's receiving commissions from Conoco, until Conklin informed him of that fact after the business had commenced.

Although the evidence upon the point is conflicting, we find that Conklin agreed to contribute to the partnership, and not to Randolph personally, 1 cent for every gallon of gas delivered to the station. The trial court in its decree, however, found to the contrary. We believe that the 1-cent per gallon contribution by Conklin to the partnership should have continued until the dissolution of the partnership by the filing of this action on December 30, 1975, as previously discussed. It is clear that Conklin did contribute one-half cent per gallon of gas delivered to the station until his employment with Conoco terminated in December 1973. Conklin is entitled to be credited with all of the money he contributed to the partnership without interest thereon. Since Randolph either made the loan payments to the Bank directly or deposited the equivalent amount in the R & F Land Co. bank account and then issued a check for the payment to the Bank, it seems clear that he paid amounts, included therein, which Conklin had agreed to pay, but did not pay. Had Conklin contributed to the partnership 1 cent for every gallon of gas delivered to the station, Randolph's required contribution would have been reduced. Accordingly, we find that Randolph is entitled to be credited with interest on the amount Conklin should have paid but did not pay to the partnership, under the provisions of the Uniform Partnership Act. Interest on the amount not paid by Conklin should be calculated

from the date Conoco paid its monthly rent, based upon the gas delivered to the station, until Randolph is repaid the excess amounts he was required to contribute, as provided by section 67-318 (c), R. R. S. 1943. In other words, all amounts which Randolph was required to pay to make up the difference between the Bank loan payments and the income earned by the partnership (excluding, however, profit earned on the sale of carwash equipment which, by agreement, was to be used to pay other partnership expenses), are to be credited to Randolph without any interest except for that portion which Conklin agreed to contribute, but did not, as noted above. Any difference between the loan payments and income earned by the partnership which has been paid by Randolph personally since the dissolution of the partnership, however, shall earn interest until the partnership is terminated.

The record also reveals that, as previously stated, Randolph loaned money to the partnership to pay the real estate taxes, special assessments, the cost of installing a lead-free gas tank, and for life insurance premiums on the lives of the partners to secure the debt owed to the Bank; and Randolph received notes from the partnership for such advances providing for 6 percent interest thereon. In the accounting, Randolph is entitled to be credited with interest at the rate of 6 percent on the notes in question. Other than the above, all other interest to be paid in this accounting procedure shall be calculated at the statutory rate of 8 percent per annum, under section 45-103, R. R. S. 1943.

One major point of contention between the parties involves the issue of whether, in the accounting, Randolph should be charged a reasonable rental for his use of the partnership premises in connection with his individual businesses of operating the service station, selling carwash services (as distinguished from carwash equipment and operations), and the

sale of travel trailers and campers. Conklin contends Randolph should be charged a reasonable rental value for the premises owned by the partnership while, on the other hand, Randolph contends their agreement was to the contrary. It is the general rule that a reasonable rental should be charged to the partner using the partnership property for his own gain, unless a contrary agreement between the parties is established. In its decree, the District Court found that Randolph was to make the payments to the Bank but no rent was to be charged to the defendants Randolph for the use of the service station building. We conclude that the District Court was correct in its finding. As revealed by the record, Conklin testified with regard to the partnership agreement as follows: "A. But there was no taxes paid and all of the money that went into this R & F Land Company account was put in by me through checks of sales, and so forth, *other than what Mr. Randolph paid in the amount of two notes that we owed at the bank in lieu of rent.* Q. What do you mean 'in lieu of rent'? There was no agreement, was there? A. No, but he didn't want to pay rent and then things had to be paid the same as the taxes but —." (Emphasis supplied.) We find there was in fact an agreement that Randolph could use the premises for his personal business rent free in exchange for his making up the difference between the partnership income and his monthly loan payments.

There are four specific transactions relating to the sale of carwash equipment and operations which were decided against the plaintiffs in the decree of the District Court and are assigned as error in the plaintiffs' brief. These items will be discussed below.

The District Court found that Conklin had not accounted for the sum of $1,567.40 involved in the "Cross Car Wash" transaction. In his evidence

adduced, in explanation of this transaction, Conklin introduced bills totaling $567.40, as representing his expenses in selling a carwash to John Budd Cross in Powell, Wyoming. Conklin further testified that he had refunded $1,000 to Cross because he was not able to deliver the particular model of carwash that Cross had ordered and was forced to substitute a less expensive model. Our review of the record convinces us that Conklin did account for the $1,567.40 involved in that transaction and should not be charged for this amount in the accounting.

The second item involved a so-called "finder's fee" which Conklin paid to his son, Clark Conklin, in connection with the Martha Nielsen carwash transaction. The evidence is conflicting as to who, in fact, made the first contact with Martha Nielsen with reference to the sale of the carwash. Randolph testified that Martha Nielsen had contacted him at the service station about a carwash operation after she had first contacted the manufacturing company who referred her to the service station. He further testified, however, that Clark Conklin, the son of Fred Conklin, was the first person who actually called on Martha Nielsen at Hot Springs, South Dakota, because his father, Fred Conklin, was too busy to do so at the time. Randolph further testified that both he and Fred Conklin had made several visits to Martha Nielsen before they sold her the carwash operation. We believe the evidence supports the finding of the District Court that the plaintiffs in the accounting should be charged with the $1,000 paid to their son as a finder's fee. We also find that, under the terms of the Uniform Partnership Act, they should be charged with interest thereon from the date the partnership paid Clark Conklin money.

The third item involved a finder's fee in the amount of $1,000 which Conklin paid to his son-in-law, Jerry Becking, for the sale of a carwash to Gwyns' Distributors, located in Silver City, New

Mexico. Conklin testified that his son-in-law found the buyer and thus was entitled to a finder's fee. Conklin also testified that he had made two trips to New Mexico at the partnership's expense and the partnership had paid for the expenses of the vice president of the Gwyn company to fly to Nebraska in order to look at one of the carwashes in operation. In its decree, the District Court found: "* * * that the Plaintiff wrongfully paid a commission of $1,000 to his son-in-law, Jerry Becking, as commission on the Gwyn transaction in that the down payment was not made to the R & F Land Company partnership or credit given therefore [sic]." It appears from the evidence, which consisted of Conklin's testimony and certain exhibits introduced into evidence, that a cashier's check for $2,500 was purchased and forwarded to the manufacturer of the carwashes, that a $1,000 partnership loan was repaid, and, presumably, a $1,000 finder's fee was paid to Conklin's son-in-law. However, we are unable to determine with any certainty as to whether or not the $4,450 down-payment from the Gwyn company is accounted for. Upon remand of this case to the District Court for further proceedings, the plaintiffs should be permitted to produce further evidence with regard to this transaction so that the District Court can definitely determine whether or not Conklin, in the accounting, should be charged with this amount, and whether interest should be charged thereon.

The fourth item involved a check for $2,087 paid by R & F Land Co. on May 19, 1972, to a partnership referred to as "Conklin-Flammang." Conklin-Flammang was a partnership between the plaintiff, Fred Conklin, and Alfred Flammang, which partnership was also later known and referred to as Mick's Car Wash, located in Gering, Nebraska. In its judgment the District Court found that the "[p]laintiff was not entitled to withdraw $2,087 from the Flamming [sic] transaction and that said

withdrawal was improper under the circumstances.'' The $2,087 check in question was signed by Fred Conklin and issued on the R & F Land Co. account, allegedly as a refund on a defective carwash operation which the manufacturer, American Car Wash Mfg., Inc., sold to Mick's Car Wash through R & F Land Co. The bank statement of R & F Land Co., introduced into evidence, shows that a $4,000 deposit was made to R & F Land Co.'s account on December 10, 1971, and also that a $4,000 check was issued on the account and paid on December 13, 1971. Also in evidence is a Scottsbluff National Bank deposit slip, dated December 10, 1971, showing that a $5,000 check from Mick's Car Wash was deposited on that date, less $1,000 paid back before the deposit was made and identified on the deposit slip with the words ''Bill Lyons.'' Other evidence established that Bill Lyons was an employee and the firm may have owed him a commission for the sale of two carwashes. Also in evidence is the actual check in the amount of $4,000, written on R & F Land Co.'s account and made payable to American Car Wash. It further appears that on January 24, 1972, a $3,995 check from Mick's Car Wash was issued, payable to R & F Land Co., with the notation thereon that $2,995 was for American Car Wash, and $1,000 for a carwash wand. The R & F Land Co.'s bank statement, for the period 12-31-71 to 1-31-72, shows that the sum of $2,995 was deposited to its account on January 24, 1972, which was the date of the $3,995 check issued by Mick's Car Wash, referred to above. The check in question was paid by the Gering National Bank on January 25, 1972. It would appear that the $5,000 paid by Mick's Car Wash to R & F Land Co. on December 10, 1971, when added to the $2,995 which Mick's Car Wash paid to R & F Land Co. on January 24, 1972, would amount to a total sum of $7,995 paid by Mick's Car Wash to R & F Land Co. for the carwash manufactured by American Car Wash. In his

testimony, Conklin testified that R & F Land Co. paid only the initial $4,000 to American Car Wash, and nothing more, because the carwash sold to Mick's Car Wash was defective; and, as previously stated, on May 19, 1972, Conklin wrote the check for $2,087 on the R & F Land Co.'s account, payable to Conklin-Flammang as a refund on the defective carwash purchased by Mick's Car Wash. The $2,087 check referred to was the amount still owed to American Car Wash which had never been paid by R & F Land Co. because the carwash sold to Mick's Car Wash was defective. It would thus appear that R & F Land Co. paid out $6,087 but received $7,995 from Mick's Car Wash, or a difference of $1,908. Of the latter amount, $1,000 was apparently paid to Bill Lyons as a commission, leaving a net gain or profit to R & F Land Co. of $908. There is testimony in the record that R & F Land Co.'s profit on the transaction was $908. We conclude that, in the accounting, Conklin should not be charged for the $2,087 he refunded to Mick's Car Wash.

Although the record reflects that both partners had originally invested $500 each in the formation of the partnership, the testimony is uncontradicted that both partners were subsequently reimbursed for their respective payments, and the final accounting should reflect this fact.

There also appears to be some testimony in the record with reference to possible income derived from the sale of carwash services at the service station. However, in the final argument before this court on appeal, plaintiffs' counsel expressly disclaimed any income therefrom, as the carwash services were not included in the partnership business. We shall therefore not consider this issue.

Finally, counsel for plaintiffs, in his reply brief filed on appeal, argues that the court should make an order concerning the distribution of $35,782.32 in checks from Conoco made payable to both parties

and endorsed to the partnership, but placed in Randolph's own bank account, which he states the trial court inadvertently omitted in its order. Although it appears Randolph did originally deposit these checks in his own bank account, the evidence reveals he used those funds in making payments upon the bank loan to the Bank, and these sums will be recovered and accounted for by the partnership upon the sale of the partnership real estate in this case. The payments received from Copsey, Inc., will likewise be accounted for by the partnership upon the sale of the real estate.

The counsel for both parties in effect argue that there has not been an actual accounting in this case, and that there cannot be until it is known what the sale price of the partnership property is after a sale. Plaintiffs also argue that there is actually no judgment at the present time in this matter for the reason that there is no specification in the decree of the trial court as to any dollars and cents amount owed by one or both of the partners to the other. In this connection we note with interest that in Black's Law Dictionary (5th Ed., 1979), the term "accounting" is defined as follows: "* * * Rendition of an account, either voluntarily or by order of a court. In the latter case, it imports a rendition of a judgment for the balance ascertained to be due. * * *" Whether or not this is the correct and generally followed definition of the term "accounting" is unimportant in the disposition of this case. However, we are in agreement that before a fair and accurate accounting between the partners in this case can finally be accomplished, it is necessary that the partnership property be sold, as originally ordered by the court, and that a further and final accounting be made by the District Court in accordance with the provisions of the Uniform Partnership Act and the specific findings of this opinion, with due consideration to any further change in circumstances which may have

occurred since this matter was appealed. Also, we note that evidence has been adduced with reference to certain uncashed checks from Conoco which were deposited in the District Court pending the outcome of this appeal. Those checks should also be included in the total proceeds of the partnership to be dealt with upon the final accounting. All costs will be paid from the proceeds of the sale before the final division of profits, if any. In the event the proceeds are insufficient to pay the creditors, and to reimburse the partners for their respective contributions, the partners, as required by the provisions of the Uniform Partnership Act, will be required to contribute equally to the partnership to satisfy the partnership's obligations. See § 67-318 (a), R. R. S. 1943.

We therefore reverse the judgment and decree of the trial court, and remand the matter for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.