In the Matter of the ESTATE OF
Phil J. THOMAS, Deceased.

Linn Patrick THOMAS, By and Through
his Conservator, Ann SCHMIDT, and
Mark Geiger, Successor Personal Repre-
sentative of the Anthony P. Thomas Es-
tate, Petitioners and Appellants,

v.

Richard C. THOMAS and Irene Thomas,
as Co-personal Representatives of the
Estate of Phil J. Thomas, Respondents
and Appellees.

In the Matter of the ESTATE
OF Anthony P. THOMAS,
Deceased.

Linn Patrick THOMAS, By and Through
his Conservator, Ann SCHMIDT, and
Mark Geiger, Successor Personal Repre-
sentative of the Anthony P. Thomas Es-
tate, Petitioners and Appellants,

v.

Richard C. THOMAS, Respondent
and Appellee.

Civ. Nos. 940212, 940213.

Supreme Court of North Dakota.

June 5, 1995.

William C. Kelsch (argued) and Todd D. Kranda (appearance), Kelsch, Kelsch, Ruff & Austin, Mandan, for petitioners and appellants.

Richard G. Hurdelbrink (argued), Mandan, for respondent and appellee Richard C. Thomas.

David L. Peterson (argued), Peterson, Schmitz, Moench & Schmidt, Bismarck, for respondent and appellee Irene Thomas.

NEUMANN, Justice.

Linn Thomas and Mark Geiger, the successor personal representative of the Estate of Anthony Thomas, appeal from a county court judgment dismissing most of their claims in two probate proceedings. We affirm in part, reverse in part, and remand for further proceedings.

Brothers Tony and Phil Thomas operated Thomas TV and Appliance and Thomas Motors as a single partnership for more than forty years. There was no written partnership agreement, but Tony and Phil shared profits equally. In 1976 they executed a buy-sell agreement. Under that agreement, upon the death of either partner the surviving partner could buy the deceased partner's 50 percent interest in the partnership businesses and assets for $110,000. The agreement also permitted the surviving partner to purchase for $15,000 the deceased partner's interest in two quarters of land in Kidder County owned jointly by Phil and Tony. The agreement also provided the partnership would pay for life insurance on each part-

ner's life, naming the other partner as beneficiary, to provide funds for a purchase under the agreement.

Tony died on August 26, 1988. His will named his son, Linn, as sole beneficiary. The will named Phil as personal representative, with another brother, Richard Thomas, named as an alternate.

Phil was appointed personal representative but resigned nine days later when he was advised his desire to purchase Tony's interest pursuant to the buy-sell agreement created a conflict of interest. Richard was then appointed personal representative of Tony's estate.

Phil gave notice he intended to exercise his option under the buy-sell agreement to purchase Tony's half interest in the partnership and the jointly owned land. On November 23, 1988, Phil, Richard, and Linn signed an agreement declaring the buy-sell agreement to be valid, and Phil made an $8,000 down payment on the purchase price.

In January 1989, Phil submitted a claim for $47,558.64 against Tony's estate. The accompanying cover letter from Phil's attorney, Bryan Giese, characterized the claim as "disproportionate amounts paid on behalf of [Anthony] Thomas as compared to amounts paid on behalf of Phil J. Thomas from the partnership properties."

On February 13, 1989, the parties met in the office of Lester Schirado, attorney for the estate, to finalize the buy-sell transaction. In addition to the partnership assets and jointly owned real property, Richard had agreed to sell to Phil Tony's 221 shares of stock in Thomas, Inc., at its par value of $100 per share.[1] Accordingly, the total amount due was:

| | |
|---|---|
| Partnership | $110,000.00 |
| Kidder County Land | 15,000.00 |
| Thomas, Inc., Stock | 22,100.00 |
| | $147,100.00 |

Richard allowed as an offset against the purchase price Phil's claim against the estate, which Phil had amended to $49,358.64. Phil paid an additional $88,741.00 by check, for the following total:

| | |
|---|---|
| Down Payment | $ 8,000.00 |
| Claim (Offset) | 49,358.64 |
| Check | 88,741.00 |
| | $146,099.64 |

Inexplicably, the parties did not notice at the time that the price tendered was $1,000.36 short. Richard subsequently conveyed Tony's interest in the partnership assets and the real estate to Phil.

While serving as personal representative, Richard used estate funds to purchase eight annuity contracts from Life Investors Insurance Company, a company for which Richard was an agent. Richard received commissions totalling $9,121.67 on these transactions. Richard was subsequently forced to withdraw funds from the annuities to pay estate bills, causing the estate to incur early withdrawal penalties of $2,041.96.

Schirado advised Richard that, as personal representative, Richard was entitled to five percent of the estate as his fee. Schirado and Richard calculated the five percent fee not only on estate assets, but also on partnership assets transferred to Phil, on property which passed by joint tenancy, and on Phil's share of certain jointly held property. As a result, Richard paid himself fees of $61,490.00 for administering the estate.

Phil died in 1991, and Phil's wife Irene and Richard were appointed co-personal representatives of his estate.

In late 1991, Linn was involuntarily committed for treatment for alcohol abuse. His mother, Ann Schmidt, was named his conservator. In early 1992, Linn through his conservator filed a claim against Phil's estate seeking to recover one-half of the value of the partnership assets. Throughout early 1992 Richard disobeyed court orders directing him to provide an inventory and accounting in Tony's estate, and on May 27, 1992, Richard was removed and Mark Geiger was appointed successor personal representative of Tony's estate. Geiger and Linn subsequently sued Richard personally for breach of fiduciary duties in his handling of Tony's estate. The two actions were consolidated for trial.

---

1. Thomas, Inc., was a real estate holding company that owned land in Mandan. Phil and Tony each owned 221 shares of its stock, and Richard owned the remaining eight shares.

The trial court entered partial summary judgment determining funds held in joint tenancy accounts passed to Phil by right of survivorship. After a bench trial, the court found Phil had properly performed under the buy-sell agreement, and affirmed the offset against the purchase price. The court awarded Linn $1,000.36, the shortage in the purchase price. On the claim against Richard, the court substantially reduced the fees and costs received by Richard but did not find Richard had breached his fiduciary duty. Judgment was entered, and Linn and Geiger appealed.[2]

The following issues are dispositive on appeal:

I. Did the trial court err in determining funds in joint tenancy bank accounts passed to Phil by right of survivorship?

II. Did the trial court err in concluding Phil's claim was properly offset against the purchase price under the buy-sell agreement?

III. Did the trial court err in determining there was no evidence that Tony's Thomas, Inc., stock was worth more than its $100 per share par value?

IV. Did the trial court err in not requiring Richard to repay to the estate commissions he received for estate transactions?

V. Did the trial court err in awarding personal representative fees and costs to Richard?

## I. JOINT TENANCY ACCOUNTS

■ Linn asserts the trial court erred in granting a partial summary judgment concluding that funds in joint tenancy bank accounts passed to Phil by right of survivorship.

At the time of Tony's death, Tony and Phil had joint tenancy accounts and certificates of deposit at various area banks. The total amount in these accounts was $456,770.00. Each was set up as a joint tenancy account with right of survivorship.

The relevant statute in effect at the time of Tony's death,[3] Section 30.1-31-04(1), N.D.C.C. [U.P.C. § 6-104], provided in pertinent part:

"*30.1-31-04 (6-104). Right of survivorship.*—1. Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created."

Thus, unless there is clear and convincing evidence that Tony and Phil intended otherwise at the time the various accounts were opened, the funds passed by right of survivorship to Phil upon Tony's death.

Linn asserts such clear and convincing evidence was established by Tony and Phil's individual income tax returns. While both were alive, Tony and Phil each claimed 50 percent of the interest from these accounts as income on their tax returns, with a notation "Joint Partnership Savings." Linn asserts this demonstrates the accounts were intended to be partnership property. However, while this may have been relevant evidence of the beneficial ownership of the accounts during the partners' lifetimes, it does not affect the survivorship feature of the account. We noted the distinction between beneficial ownership during lifetime and survivorship features of such accounts in *In re Conservatorship of Milbrath*, 508 N.W.2d 360, 362 (N.D.1993). Section 30.1-31-03(1), N.D.C.C. [U.P.C. § 6-103], provided:

"*30.1-31-03 (6-103). Ownership during lifetime.*—1. A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, un-

2. For the sake of brevity, Linn and Geiger will hereafter be collectively referred to as Linn.

3. In 1991, the Legislature repealed Chapter 30.1-31 and enacted a new Chapter 30.1-31 derived from Revised Article VI of the Uniform Probate Code. *See* 1991 N.D.Sess.Laws Ch. 351; *In re Estate of Leier*, 524 N.W.2d 106, 107 (N.D.

1994); *In re Conservatorship of Milbrath*, 508 N.W.2d 360, 361 n. 1 (N.D.1993). The parties agree that the pre-1991 version of Chapter 30.1-31 governs this case. All references herein to sections within that chapter refer to the pre-1991 provisions.

less there is clear and convincing evidence of a different intent."

Because Tony and Phil shared partnership profits equally, each was the beneficial owner of 50 percent of the accounts. Their treatment of the income on their tax returns is consistent with such ownership, and is not indicative of an intent contrary to the terms of the joint accounts.

■ Linn also asserts that Phil, while briefly serving as personal representative of Tony's estate, included these accounts under the heading "Partnership" in an informal, handwritten inventory of Tony's estate. As noted by the trial court, that inventory was prepared to assist the estate's attorney to prepare a tax return for Tony's estate, and property passing by joint tenancy would be required to be listed on the estate tax return. The court thus concluded, and we agree, this evidence did not raise an inference that Tony and Phil did not intend at the time the accounts were created that the funds would pass by survivorship.

■ Furthermore, even if the accounts were partnership property, Tony and Phil were free to predetermine how those funds would pass upon the death of one partner. In *Jones v. Jones*, 310 N.W.2d 753 (N.D. 1981), this court held partners could, by an oral partnership agreement, provide that the survivor would receive all partnership assets by right of survivorship. If partners are free to do so by oral agreement, they certainly can provide for survivorship rights in specific partnership property by signed, written account agreements.

Linn did not present evidence which would support a finding by clear and convincing evidence that Tony and Phil had some other intent when they created these joint tenancy accounts. We conclude the trial court did not err in granting summary judgment holding the accounts passed to Phil by right of survivorship.

## II. ALLOWANCE OF PHIL'S CLAIM AS AN OFFSET

Linn asserts the trial court erred in concluding Phil's claim was properly offset against the purchase price under the buy-sell agreement. Linn further asserts Phil's attempted purchase under the agreement therefore failed, and that Linn is entitled to the value of one-half of the partnership and the Kidder County land at the time of Tony's death. We agree.

Phil's claim represented alleged disproportionate benefits Tony received from the partnership during his lifetime. The claim consisted of three items: $21,000.00 (140 months at $150) in rent Phil claimed Tony owed on a partnership-owned apartment; $11,000.00 for extra vacation time Tony took; and $17,-358.64 to equalize insurance premiums paid by the partnership on the life of each partner.

The apartment rent represented one-half of the monthly rental value of an apartment Tony lived in for 11½ years, from 1977 until his death in 1988.[4] Linn asserts Phil's claim is overstated, including rent for months before the apartments were built. Tony's apartment was located above the partnership's used appliance, repair, and parts store. While living there rent-free, Tony also managed the other apartments in the building and provided emergency services on evenings and weekends to customers of the appliance business.

The vacation time offset represents a claimed inequity in the partners' annual vacations. Phil apparently took two week vacations each year, while Tony took an annual six-week fishing trip to Mexico. Phil's claim is for $1,000 each year for eleven years to equalize the difference.

The insurance premium claim is for the higher premiums paid by the partnership on policies on the life of Tony, the older brother, during the years 1977 to 1988. Linn points out Phil was actually the beneficiary on many of these policies, and received the benefit of the higher premiums.

---

4. The trial court erroneously found that Tony had paid $150 per month rent, and that the claim was for an additional $150 per month rent. The record clearly demonstrates Tony paid no rent, and the $150 per month sought was for one-half the $300 market rate for the apartment.

The transaction finalizing the sale to Phil took place in Schirado's office on February 13, 1989. The testimony regarding this meeting is sketchy, but the record shows Phil told Linn "what's fair is fair." Linn testified, "I told them that Richard was in charge of the estate now, and if we owed a bill, he should pay it." The trial court concluded Phil owed no fiduciary duty to Tony's estate or to Linn, and had not concealed information or misled Linn; that Richard had not breached a fiduciary duty in allowing the claim; and that Linn had agreed to payment of the claim based upon his belief "his father had agreed to make payment for the amounts claimed and that he wished to honor his father's intentions."

The trial court's resolution of this issue was premised upon two fundamental errors: the court erroneously concluded Phil owed no fiduciary duty to Tony's estate or to Linn, and the court erroneously found there had been an agreement between Phil and Tony to equalize benefits and contributions under the partnership.

■ The significance of the court's erroneous finding of an agreement between Phil and Tony to adjust for unequal contributions is apparent when reviewing North Dakota partnership law. Section 45–07–01(6), N.D.C.C., provides "[n]o partner is entitled to remuneration for acting in the partnership business," absent an agreement between the partners. A series of cases clarifies that, in the absence of an agreement, a partner is not entitled to receive compensation for services rendered to the partnership business "merely by reason of any inequality of services rendered by him, as compared with those rendered by his copartners." *Olivier v. Uleberg*, 74 N.D. 453, 23 N.W.2d 39, 42 (1946); *see also First National Bank of Belfield v. Candee*, 488 N.W.2d 391, 397–398 (N.D.1992); *Degen v. Brooks*, 77 N.D. 514, 43 N.W.2d 755, 763 (1950). As further explained in *Degen, supra*, 43 N.W.2d at 763:

> "Ordinarily, the right of a partner to participation in the partnership profits is not based on the extent of his services to

the partnership unless there is a special agreement to that effect.

> " 'By the well settled law of partnership every partner is bound to work to the extent of his ability for the benefit of the whole without regard to the services of his copartners and without comparison of value; for services to the firm cannot, from the very nature, be estimated and equalized by compensation of differences.' 1 Rowley's Modern Law of Partnership, 405, Sec. 351."

*Candee, supra*, also indicates that the failure to make annual claims or accountings for unequal contributions and benefits is indicative the partners did not intend to equalize them.

■ In this case, there was no evidence the partners had annually, or ever, made claims or accountings for unequal contributions or benefits. Rather, Phil waited until his brother had died to make a claim covering the prior 11½ years. Absent evidence of an agreement between Tony and Phil to account for unequal services, such a claim is unenforceable under North Dakota partnership law.

The trial court found there was such an agreement; however, the record is devoid of any evidence to support that finding. Phil's written claim bore no mention of an agreement, and attorney Giese's cover letter, although indicating the claim was for disproportionate benefits, makes no mention of an agreement between the partners. The testimony at trial was also silent as to an agreement. The only relevant evidence is Phil's comment that "what's fair is fair." There was no testimony that Phil alleged an agreement with Tony to equalize these amounts. Linn specifically denied knowledge of any such agreement between Tony and Phil, yet the trial court found "Linn believed his father had agreed to make payment for the amounts claimed." Accordingly, the trial court's finding of an agreement is without support in the evidence and is clearly erroneous.[5]

---

5. Phil's estate asserts Richard's testimony about a 1983 conversation with Tony provides evidentiary support for the court's findings. In 1983 additional life insurance policies were taken out on Tony and Phil, with Linn and Irene, respectively, as beneficiaries. Premiums were to be

■ Additionally, a large part of Phil's claim would have been barred by a properly asserted statute of limitations. *See* Section 30.1–19–02, N.D.C.C. [U.P.C. § 3–802]. It is undisputed all of Phil's claim arising more than six years before the claim was filed would have been barred. *See* Section 28–01–16(1), N.D.C.C. As to those parts of Phil's claim, the estate had a valid defense.

We conclude Phil's claim was legally unenforceable.[6] If this were an appeal from an order allowing Phil's claim against the estate, this would end our analysis. However, in this case Phil's charges were not allowed as a claim against Tony's estate, but rather were allowed as an offset against the purchase price under the buy-sell agreement. Thus, Linn's action is for fraud and undue influence against Phil's estate, and we must consider the unenforceability of Phil's claim in that context.

■ The linchpin of Phil's estate's argument on this issue is the trial court's conclusion that Phil owed no fiduciary duty to Tony's estate and Linn, and was dealing with them at arm's length when he purchased the partnership and the Kidder County land. Thus, Phil's estate asserts Phil was free to submit a facially unenforceable claim and, as long as Phil did not actively conceal information or fail to disclose material facts, he breached no duty. Linn asserts the court's erroneous conclusion that Phil owed no fiduciary duty is crucial, because it deprived Linn of statutory presumptions which would have shifted the burden of proof to Phil's estate.

■ Section 45–07–04, N.D.C.C. [U.P.A. § 21], establishes fiduciary duties between partners. The relationship between partners is confidential and fiduciary; they are trustees for each other, and they bear the obligation of the utmost good faith and integrity in their dealings with one another. *Svihl v. Gress,* 216 N.W.2d 110, 115–116 (N.D.1974); *Engstrom v. Larson,* 79 N.D. 188, 55 N.W.2d 579, 587 (1952); *see also Froemming v. Gate City Federal Savings and Loan Ass'n,* 822 F.2d 723, 730–731 (8th Cir.1987). Cases from other states that have adopted the Uniform Partnership Act, from which our statute was derived, have uniformly held a partner's fiduciary duties extend to the estate of a deceased partner. *See, e.g., Jacoby v. Feldman,* 81 Cal.App.3d 432, 146 Cal.Rptr. 334, 340 (1978); *Spencer v. Spencer,* 91 Idaho 880, 434 P.2d 98, 102–103 (1967); *Weaver v. Watson,* 130 Ill.App.3d 563, 85 Ill.Dec. 799, 803, 474 N.E.2d 759, 763 (1984); *Pendleton v. Strange,* 381 S.W.2d 617, 619 (Ky.1964); *Collier v. Benjes,* 195 Md. 168, 73 A.2d 21, 24 (1950); *Phillipson v. Phillipson,* 302 Mich. 84, 4 N.W.2d 477, 479 (1942); *Chapman v. Dunnegan,* 665 S.W.2d 643, 647 (Mo.Ct.App. 1984); *In re Mondale and Johnson,* 150 Mont. 534, 437 P.2d 636, 641 (1968); *Blut v. Katz,* 36 N.J.Super. 185, 115 A.2d 119, 122 (1955); *Birnbaum v. Birnbaum,* 157 A.D.2d 177, 555 N.Y.S.2d 982, 988 (1990); *Lee v. Dahlin,* 399 Pa. 50, 159 A.2d 679, 681 (1960); *see also* Randleman, *The Fiduciary Responsibilities of a Surviving Partner Acting as Executor of the Deceased Partner's Estate,* 33 Vand.L.Rev. 175, 179–182, 186 (1980); McNamara, *Rights of a Deceased Partner's Estate in Partnership Assets,* 24 J.Fam.L. 673, 686–687 (1985–1986).

---

paid out of partnership funds. When Tony was advised the premiums on his policy were higher than Phil's, he told Richard he would pay back the difference.

We do not view this as evidence of an *agreement* between Tony and Phil to account for all unequal services and benefits. It relates to only one of several insurance policies, and does not address at all the rent or vacation issues. Most importantly, Tony did not indicate there was an agreement to reimburse the partnership, only that he intended to do so. This evidence does not establish an agreement between Tony and Phil to reimburse the partnership for disproportionate benefits and services.

**6.** Phil's estate has not argued on appeal that, under Section 45–07–04(1) [U.P.A. § 21], Tony would be liable for rent for his use of an apartment owned by the partnership. *See Conklin v. Randolph,* 204 Neb. 332, 281 N.W.2d 913, 919 (1979). Even if we were to recognize a possible claim for rent for those months not barred by the statute of limitations, that would validate only a small portion of Phil's claim. Furthermore, any such argument would have to be viewed in light of the additional on-site services Tony rendered to the partnership because he was on the premises, and take into account Phil's failure to make a claim for over 11½ years while his brother was alive.

■ A surviving partner's fiduciary obligations extend to the deceased partner's heirs and beneficiaries. *See, e.g., United States v. Hankins,* 581 F.2d 431, 435 (5th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979) (applying Mississippi law); *In re Perrin,* 2 B.R. 316, 319 (Bankr.S.D.N.Y.1980) (applying New York law); *Moore v. Moore,* 255 Ala. 393, 51 So.2d 683, 689 (1951); *Sibert v. Shaver,* 111 Cal. App.2d 833, 245 P.2d 514, 519 (1952); *Moorman v. Moorman,* 226 Ind. 192, 79 N.E.2d 112, 114 (1948); *Malden Trust Co. v. Brooks,* 291 Mass. 273, 197 N.E. 100, 106 (1935); *C.B. & T. Co. v. Hefner,* 98 N.M. 594, 651 P.2d 1029, 1035–1036 (Ct.App.1982); *Bennett v. Anson Bank & Trust Co.,* 265 N.C. 148, 143 S.E.2d 312, 316 (1965); *Simpson v. Kistler Investment Co.,* 713 P.2d 751, 762 (Wyo. 1986); 59A Am.Jur.2d Partnership § 1147 (1987); 68 C.J.S. Partnership § 285(b)(1) (1950); *cf. In re Conservatorship of Stensland,* 526 N.W.2d 485, 486–487 (N.D.1995) (a conservator's fiduciary duty extends not only to the ward and the ward's estate, but also to other persons interested in the estate); *Thompson v. First National Bank in Grand Forks,* 269 N.W.2d 763, 764 (N.D.1978) (same). The rationale underlying this rule is based upon the surviving partner's superior knowledge:

> "A surviving partner does not deal at arms length with the heirs of a deceased partner, but must make an open and full disclosure to them. The heirs are at a big disadvantage in dealing with the surviving partners, lacking knowledge of the extent of the partnership property or information about the amount of business done or the value of the partnership. Thus, in regard to the deceased partner's interest in the partnership, the surviving partners are treated in equity as trustees of the decedent's representatives."

59A Am.Jur.2d Partnership § 1147 (1987) (footnotes omitted); *see also Moorman, supra,* 79 N.E.2d at 114.

We conclude Phil owed a fiduciary duty to Tony's estate and Linn, and was a trustee as to all transactions with Tony's estate and Linn.

■ Section 59–01–16, N.D.C.C., creates a statutory presumption of undue influence when a trustee gains an advantage through a transaction with his beneficiary:

> "*Presumption against trustee.* All transactions between a trustee and his beneficiary during the existence of the trust or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration and under undue influence."

The effect of the statute is to shift the burden of proof on the issue of undue influence to Phil to prove the nonexistence of the presumed fact is more probable than its existence. Rule 301, N.D.R.Evid.; *Estate of Zins by Kelsch v. Zins,* 420 N.W.2d 729, 730–731 (N.D.1988). Because Phil clearly obtained an advantage over Tony's estate and Linn by the allowance of his unenforceable claim, a presumption of undue influence arose. Phil's estate presented no evidence which would rebut this presumption.

■ Furthermore, under Section 9–03–09, N.D.C.C., constructive fraud is presumed when a breach of a fiduciary or confidential duty is shown. *See Land Office Co. v. Clapp–Thomssen Co.,* 442 N.W.2d 401, 406 (N.D.1989). Again, the effect of the presumption is to shift the burden of proof to the opposing party to establish the nonexistence of the presumed fact. Rule 301, N.D.R.Evid.; *Land Office, supra,* 442 N.W.2d at 406. Phil clearly breached his fiduciary duty to act in the highest good faith by submitting a facially unenforceable claim for reimbursement going back over 11½ years. This breach creates the basis of a presumption of constructive fraud. No evidence was presented which rebutted that presumption.

■ Phil's estate asserts Linn's acquiescence in paying the claim waives or cures any irregularities. This assertion merely begs the question. If there is a presumption of constructive fraud and undue influence, any acquiescence by Linn was tainted by the fraud and undue influence. Furthermore, Linn's "acquiescence" was hardly "knowing": he was not told the claim was unenforceable

under North Dakota partnership law or that much of it was barred by the statute of limitations. *See* Section 30.1–19–02, N.D.C.C. [U.P.C. § 3–802]. All Linn was told about the claim was "what's fair is fair," and Linn's response was "if we owed a bill, [we] should pay it."

We conclude the trial court made erroneous conclusions of law and findings of fact, leading it to misapply the burden of proof on the crucial issues of fraud and undue influence. We further conclude this led to an erroneous resolution of the issues by the trial court. Phil breached his fiduciary duty by submitting an invalid, unenforceable claim as an offset against the purchase price, thereby giving rise to presumptions of constructive fraud and undue influence. No evidence was presented which rebuts those presumptions. We conclude the trial court erred in upholding the offset of Phil's claim against the purchase price under the buy-sell agreement.[7]

 The remaining question is one of remedy. Phil's estate asserts that, if we disallow the claim, we should nevertheless uphold Phil's exercise of the buy-sell agreement and remand only for entry of judgment for payment of the additional amount. Linn asserts he is entitled to the value of his father's 50 percent interest in the partnership and the Kidder County land at the time of his death.

 The buy-sell agreement was an option contract, giving the survivor the option to purchase the deceased partner's share by giving notice to the personal representative within two months of the partner's death, and by paying the purchase price in full within six months of the partner's death. Special rules govern enforcement of option contracts. In order to obtain an enforceable right to the property, the optionee must exercise the option within the time and upon the terms and conditions provided in the option agreement. *Fries v. Fries,* 470 N.W.2d 232, 233 (N.D.1991); *Wessels v. Whetstone,* 338 N.W.2d 830, 832 (N.D.1983). The offer must be accepted unequivocally and in accordance with the terms of the option. *Fries, supra,* 470 N.W.2d at 233–234; *Wessels, supra,* 338 N.W.2d at 832. Because the optionee is free to exercise the option or not, but the optionor is bound to perform if the option is properly exercised, an optionee is held to "exact compliance" with the terms of the option. *Fries, supra,* 470 N.W.2d at 234.

Phil did not strictly comply with the terms of the option requiring payment in full within six months of Tony's death. The failure of his claim as an offset has rendered the purchase price far short of that required under the buy-sell agreement. His estate's attempt at this late date to pay the remaining sums owed does not constitute "exact compliance" with the terms of the option. Phil did not properly exercise his option and the buy-sell agreement has expired and is no longer enforceable.

Tony's estate, and ultimately Linn as the sole heir, is therefore entitled to recover the value of Tony's 50 percent interest in the partnership and the Kidder County land at the time of Tony's death, with an offset for amounts actually paid to Tony's estate under the buy-sell agreement. We remand for a determination of the value of Tony's 50 percent interest.

### III. SALE OF STOCK

 Linn asserts the trial court erred in rejecting his claim against Richard for breach of fiduciary duty in the sale of Tony's 221 shares of stock in Thomas, Inc., a real estate holding company. Richard sold Tony's shares to Phil at their $100 par value without determining the assets or value of the corporation. The trial court did not make a finding whether this constituted a breach of fiduciary duty, but resolved the issue by finding there was "no evidence presented from which the Court can conclude that the shares could have been sold for more than $100 per share." We conclude Richard breached his fiduciary duty and that there was evidence to support a finding that

---

7. Because we conclude the trial court erred in upholding the claim as an offset against the purchase price, we find it unnecessary to address

whether Richard's allowance of the claim constituted a breach of his fiduciary duties to Tony's estate and Linn.

686

the shares had a fair market value of more than $100.

 A personal representative is a fiduciary who must observe the standards of care applicable to trustees. Section 30.1–18–03(1), N.D.C.C. [U.P.C. § 3–703]; *In re Estate of Ridl,* 455 N.W.2d 188, 192 (N.D.1990). The personal representative's fiduciary obligation requires that he act reasonably for the benefit of the heirs, creditors, and other parties interested in the estate. *In re Estate of Rolczynski,* 349 N.W.2d 394, 397 (N.D.1984); *Lindemann v. Lindemann,* 336 N.W.2d 112, 115–116 (N.D.1983). Section 30.1–18–12, N.D.C.C. [U.P.C. § 3–712], provides that the personal representative is liable to interested persons for damage or loss resulting from a breach of his fiduciary duty. *See Ridl, supra,* 455 N.W.2d at 192.

 The personal representative must settle and distribute the estate as expeditiously and efficiently as is consistent with the best interests of the estate. Section 30.1–18–03(1), N.D.C.C. [U.P.C. § 3–703]; *Ridl, supra,* 455 N.W.2d at 192; *Rolczynski, supra,* 349 N.W.2d at 397. The personal representative must inventory and determine fair market value of the decedent's property. Section 30.1–18–06(1), N.D.C.C. [U.P.C. § 3–706]. If the personal representative sells estate property, he must obtain the best possible price:

"If, in the administration of the estate, the personal representative undertakes to sell property of the estate, his fiduciary obligation requires him to secure the best price obtainable under the circumstances. He may not merely sit dormant and accept such offers as are tendered to him, but must make diligent, impartial effort to obtain the best offer possible. Thus, an executor's trust is not discharged by selling at the appraised price unless there is evidence to show that was the best price that could be obtained in the exercise of reasonable diligence."

31 Am.Jur.2d Executors and Administrators § 768 (1989) (footnotes omitted); *see also* §§ 805, 816.

Richard's actions in selling the stock to Phil for par value fell far short of his obligation to determine fair market value and obtain the best possible price. Richard testified he did not know what assets the corporation owned, did not know the value of those assets, never looked at any financial records of the company, and did not employ an outside appraiser to value the corporation or its assets. *See* Section 30.1–18–07, N.D.C.C. [U.P.C. § 3–707]. Richard clearly breached his fiduciary duties by selling estate assets without making any inquiry into their actual value.

Richard asserts, however, that his misconduct is excused because he relied upon the advice of counsel in determining to sell the stock to Phil at par value. In fact, Richard's response to every allegation in these cases is that he just did what the estate attorney, Schirado, told him.

 A personal representative may not avoid liability for breach of his fiduciary duty to the heirs of the estate by asserting a blanket defense of reliance upon counsel. A personal representative may reasonably rely upon *legal* advice from counsel. *Murdock v. Murdock,* 370 So.2d 290, 292 (Ala.1979); *Jewish Hospital of St. Louis v. Boatmen's National Bank of Belleville,* 261 Ill.App.3d 750, 199 Ill.Dec. 276, 290, 633 N.E.2d 1267, 1281 (1994); *In re Estate of Gangloff,* 743 S.W.2d 498, 501 (Mo.Ct.App.1987); *Christie v. Dold,* 524 N.W.2d 866, 871 (S.D.1994); 31 Am. Jur.2d Executors and Administrators § 448 (1989). However, that rule does not translate to an all-encompassing defense for reliance upon counsel on non-legal duties specifically delegated to the personal representative. *See, e.g., Murdock, supra,* 370 So.2d at 293; *In re Estate of Hollaway,* 631 So.2d 127, 134 (Miss.1993); *In re Estate of Bartlett,* 680 P.2d 369, 377 (Okla.1984); *Christie, supra,* 524 N.W.2d at 871; 31 Am.Jur.2d Executors and Administrators §§ 449 and 450; *see also* cases collected at Annot., 28 A.L.R.3d 1191, § 3[b] (1969). The personal representative is responsible for the inventory and appraisal of the estate, and for sale of estate property. *See* Sections 30.1–18–06(1) and 30.1–18–15(6), N.D.C.C. [U.P.C. §§ 3–706 and 3–715]. His fiduciary obligations related thereto are personal, and cannot be delegated to his attorney.

The trial court resolved this issue by concluding there was "no evidence" the stock could have been sold for more than the $100 per share par value. However, Linn presented evidence that a single piece of property owned by the corporation had a tax value of $64,100.00, and the annual report of Thomas, Inc., filed one month before Tony's death, showed corporate assets valued at $73,449.84. The court did not explain its reasons for discounting this evidence, or the rationale for its finding there was "no evidence" of a higher value.

 Net asset value has been recognized as one permissible method of valuing stock in a closely held corporation. *See Brown v. Hedahl's—QB & R, Inc.*, 185 N.W.2d 249, 256 (N.D.1971). It is now widely accepted that valuation based upon a corporation's net assets is appropriate where the corporation is a real estate holding company. 12B Fletcher, Corporations § 5906.140 (1993). Thomas, Inc., was a real estate holding company. If the $64,100.00 or $73,449.84 figures provided by Linn are accurate, each of the 450 outstanding shares of stock had a value of between $142.44 and $163.22 using the net asset value method. Because there is no indication the trial court considered this valuation method, we conclude the court's finding of "no evidence" of a greater value is clearly erroneous.

We conclude Richard breached his fiduciary duty by selling the shares of stock to Phil for par value without inquiring into the assets or financial status of the corporation. We remand for a determination of the true and correct value of the stock on the date of the sale to Phil. If that value is greater than $100 per share, Richard is liable for the difference.

## IV. COMMISSIONS ON ANNUITY CONTRACTS

 Linn asserts Richard breached his fiduciary duty by accepting commissions on the estate's purchase of annuity contracts from Life Investors Insurance Company. The trial court, without determining whether Richard breached his fiduciary duty, concluded Linn had presented no evidence establishing the estate was damaged by Richard's self-dealing.

While serving as personal representative, Richard was employed as an agent of Life Investors. He invested $369,042.84 in estate funds in annuities through Life Investors, and personally received commissions of $9,121.67 on those transactions. He did not advise Linn he had received those commissions. When the estate ran short of funds to pay bills, Richard withdrew funds from the annuities, incurring penalties of $2,041.96.

Section 30.1–18–13, N.D.C.C. [U.P.C. § 3–713], strictly prohibits a personal representative from engaging in estate transactions in which he has a conflict of interest or derives a personal benefit. This prohibition against self-dealing lies at the heart of the fiduciary relationship. *See Williamson v. Williamson,* 407 F.Supp. 370, 372–373 (E.D.Va.1976) (applying Virginia law); *In re Estate of Allison,* 140 Ill.App.3d 183, 94 Ill.Dec. 788, 792, 488 N.E.2d 1035, 1039 (1986); *In re Estate of Snapp,* 502 N.W.2d 29, 33 (Iowa Ct.App. 1993); *Birnbaum v. Birnbaum,* 117 A.D.2d 409, 503 N.Y.S.2d 451, 456 (1986); *Ollick v. Rice,* 16 Ohio App.3d 448, 476 N.E.2d 1062, 1071 (1984); *Miller v. Hawkins,* 416 Pa. 180, 205 A.2d 429, 436 (1964); *Murphy v. Canion,* 797 S.W.2d 944, 949 (Tex.Ct.App.1990). The rationale for the rule is explained in *Birnbaum, supra,* 503 N.Y.S.2d at 456:

"One of the most stringent precepts in the law is that a fiduciary shall not engage in self-dealing and when he is so charged, his actions will be scrutinized most carefully. When a fiduciary engages in self-dealing, there is inevitably a conflict of interest: as fiduciary he is bound to secure the greatest advantage for the beneficiaries; yet to do so might work to his personal disadvantage."

Because the personal representative is a trustee of the estate for the benefit of the heirs and creditors, he is bound by the provisions of Chapter 59–01, N.D.C.C. *Cudworth v. Cudworth,* 312 N.W.2d 331, 335 (N.D. 1981); *see* Section 30.1–18–11, N.D.C.C. [U.P.C. § 3–711]. Section 59–01–11, N.D.C.C., provides a trustee may not take part in any transaction concerning the trust if he has any interest adverse to the benefi-

ciary. *See Cudworth, supra*, 312 N.W.2d at 336. Section 59–01–10, N.D.C.C., provides:

> *"Trustee shall not profit by use of property*. A trustee shall not use or deal with the trust property for his own profit or for any other purpose not connected with the trust. If he does so, he, at the option of the beneficiary, may be required to account for all profits made thereby, or to pay the value of the use of the trust property, and, if he has disposed thereof, to replace it with its fruits or to account for its proceeds with interest."

Richard clearly breached his fiduciary obligations by engaging in transactions with estate property through which he acquired personal benefits. We conclude Richard must be required to account to Tony's estate for all commissions he realized on estate transactions with Life Investors.

## V. PERSONAL REPRESENTATIVE'S FEES

■ Richard originally paid himself personal representative's fees of $61,490.00, which was calculated as five percent of the estate. However, Richard and Schirado included a vast amount of non-estate property in the total on which the percentage was based. Richard also paid himself costs of $17,124.38. The trial court reduced the fees to $10,000 and cut the costs in half, to $8,562.19. Richard was therefore ordered to repay $60,052.19 to Tony's estate. Linn asserts on appeal that, because Richard charged excessive fees, breached his fiduciary duties, personally profited from estate transactions, and disrupted the orderly and efficient administration of the estate, Richard's fees and costs should be further reduced.

This issue is closely intertwined with the trial court's resolution of the self-dealing issue. The trial court, although concluding there was no evidence that Richard's self-dealing harmed the estate, stated it would consider the commissions earned by Richard when it set fees for administering the estate:

> "There was no evidence that the estate was damaged by the purchase of the annuities or that, even with penalties, the annuities did not provide a better return than other investment of estate funds might have. Although the Court will not require Richard to repay the estate these funds, the Court will consider the amounts received by Richard in determining the reasonableness of the compensation he received for acting as personal representative of the estate."

The trial court then determined fees and costs as follows:

> "[T]he Court concludes that Richard should have been able to do whatever work was necessary for the estate in 500 hours or less, and that a fee of $20 per hour would be reasonable. Richard should be paid $10,000 for his work on the estate. The Court cannot conclude the expenses claimed were reasonable, and will allow only half of the expenses claimed, or $8,562.19. In making these determinations, the Court is considering the funds received by Richard when annuities were purchased and the expense he caused to the estate through his failure to cooperate with Linn's conservator or to comply with court orders directing him to produce information."

Because our holding that Richard must return the commissions necessarily affects the trial court's determination on fees and costs, we must remand for a redetermination of fees and costs. In resolving this issue, the court should also keep in mind our conclusion that Richard's self-dealing constituted a breach of his fiduciary obligations to the estate and Linn.

The remaining issues raised by the parties have either been resolved by the issues addressed, or have been considered and found to be without merit. We affirm the partial summary judgment holding funds in joint tenancy accounts passed to Phil by right of survivorship. The remainder of the judg-

ment is reversed and we remand for further proceedings consistent with this opinion.

VANDE WALLE, C.J., LEVINE and MESCHKE, JJ., and LAWRENCE A. LECLERC, District Judge, concur.

LAWRENCE A. LECLERC, District Judge, sitting in place of SANDSTROM, J., disqualified.